HARRY B. PARSONS ET AL *vs.* JOHN D. URIE.

*Equity—Parties Bound by Decree—Payment of Debt by Mortgagor After Sale of His Equity Subject to Mortgage—Subrogation of Mortgagor to Rights of Mortgagee Against the Land— Vacating Release of Mortgage.*

Those who are directly interested in the subject-matter of an equity suit, know of its pendency and have the right to direct or defend it are bound by the decree passed therein although not made formal parties of record.

When the interest in land of a mortgagor is sold, voluntarily or under an execution sale, subject to the mortgage, the purchase-price being lessened to that extent, and subsequently the mortgagor pays the mortgage debt, he is subrogated to the rights of the mortgagee against the land. In such case the payment of the mortgage does not extinguish the lien.

When one or more of several tenants in common pays the joint mortgage debt on their land, he is entitled to have the mortgage kept alive so as to secure reimbursement of the amount paid from his co-tenants.

The equity of redemption in certain mortgaged land was owned as to one-third interest therein by H. and as to one-sixth interest each by four other persons, two of whom were infants. The one-third interest of H. was sold to third parties under an execution sale, subject to the mortgage. The mortgagee advertised the whole property for sale under foreclosure, whereupon the amount of the mortgage-debt was tendered by H. and the two other adult mortgagors, who had covenanted to pay the debt. The mortgagee refused to assign the mortgage, but accepted the amount tendered and then, without the consent of the mortgagors, released the mortgage of record. Upon a bill by said

mortgagors. *Held*, that the unauthorized release of the mortgage should be vacated and the parties so paying the mortgage-debt be subrogated to the rights of the mortgagee against the land.

That the purchasers of the one-third interest of H. at the execution sale are not benefited by such payment of the mortgage but hold only the value of that interest subject to its share of the mortgage-debt, and that the same principle applies to the shares of the two infants who did not contribute to the payment.

That the property should be sold, or so much thereof as is necessary for the reimbursement of the mortgagors who paid the mortgage-debt in the proportions in which they contributed.

*Decided November 1st, 1906.*

Appeal from the Circuit Court for Kent County (BROWN, J.)

The cause was argued before MCSHERRY, C. J., BRISCOE, BOYD, SCHMUCKER JONES and BURKE, JJ.

*Hope H. Barroll* and *James P. Gorter*, for the appellants.

At the time of the foreclosure proceedings the farm "Mount Pleasant" was encumbered by the mortgage assigned to John D. Urie which with back interest and costs amounted to $2,025. The equity of redemption was owned by Wm. G. Parsons, Grace N. Clark, Lewis B. Parsons and E. Romie Morris to the extent of one-sixth, and by Richard D. Hynson and William W. Beck to the extent of one-third, they having purchased at a sheriff's sale the one-third interest of Harry B. Parsons in the equity of redemption. On February 1st, 1902, William G. Parsons, Grace N. Clark and Harry B. Parsons paid to John D. Urie, the then holder of the mortgage, the sum of $2,025, which was the amount of the mortgage principal, interest and costs, under the circumstances shown by the evidence. The question of law raised by these facts is: Was the mortgage thereby released so that the same is entirely extinguished, and those who held undivided shares in the equity of redemption now hold undivided shares in the unincumbered farm? Or are those who paid the money to the assignee of the mortgagee subrogated to the rights of the mortgage, so that those who were possessed of undivided shares in the

equity of redemption subject to the mortgage, and who paid
none of said money have still the interest they held prior to
the payment of the said money, which as to the infants Lewis
B. Parsons and E. Romie Morris would be the interest they
inherited, and as to Richard D. Hynson and William W. Beck,
would be the interest they bought?   In other words when
three of those liable for the debt secured by the mortgage in
order to save the costs of the sale of the farm, which was pri-
marily liable for the mortgage, and in order to prevent, as
they thought, a sacrifice of the property in which they were
interested, paid to the holder of the mortgage, the amount of
money due thereon, is the effect of this act upon their part to
enhance the value of the interest of the other owners of the
equity of redemption, the infants Lewis B. Parsons and E.
Romie Morris each to the extent of one-sixth of the money,
viz., $337.50 and the interest of Richard D. Hynson and
William W. Beck to the extent of one-third or $675.00, or to
leave the respective interest of the parties practically as they
were before?   If this were a question of right and justice, no
two fair minds could differ as to the answer to the question.
Nor is there any doubt as to the way a Court of equity will
consider this transaction.   It will hold that those paying the
money are subrogated to the rights under the mortgage.   The
trial Court recognized this principle and applied it as to the share
of the two infants, Lewis B. Parsons and E. Romie Morris,
but failed to recognize its application to the one-third equity
of redemption held by Hynson and Beck.

The effect of the Court's decree is to make Mrs. Clark,
William G. Parsons and Harry B. Parsons pay $675 that
Hynson and Beck get the benefit of.   Suppose Mrs. Clark
and William G. Parsons alone had paid the money which they
as owners of one-sixth each of the equity of redemption had
a right to and were compelled to pay in order to save their
property from a sacrifice and to avoid the costs incidental to a
sale, could it for a minute be contended that they thus con-
tributed to Hynson and Beck the $675, or its equivalent by
enhancing their interest in the farm?   The conscience of any

person would revolt from such a conclusion.   Is the principle affected by the fact that Harry B. Parsons is jointly liable for said indebtedness?   It is true he no longer had any interest in the farm, but he was liable on his covenant, and he had the right to interfere to prevent his personal indebtedness being increased by costs and expenses, and to protect himself by seeing that the farm paid off the mortgage thereon.   Indeed, to put the strongest case for the appellees that can be put, suppose that Harry B. Parsons was the sole mortgagor, and Hynson and Beck had become the owners of his equity of redemption and Harry B. Parsons alone had paid the whole sum under the circumstances of this case, still he would have been subrogated to the rights under the mortgage, and the fact that he was liable under the covenant in the mortgage, would not have had the effect of releasing the mortgage as decided by the Court below, but he still would have had the right to have the mortgage continued alive, for the purpose of reimbursing him for the money he had so laid out.   The principal involved in this doctrine is extremely simple.   The land is primarily liable for the debt.   In this case the debt was placed on the land by the ancestor, even before Harry B. Parsons acquired any interest therein.   The land is the primary fund to pay the debt,   The covenantor in the mortgage is but the surety.   When Hynson and Beck bought Harry B. Parsons' interest they bought an incumbered interest and paid the price only that an incumbered interest was worth.   It was, therefore, the property which they held that was to pay the debt primarily, and when paid by the covenantor, either upon the demand of the mortgagee or to prevent a sale of the premises, the mortgage is not released so as to enhance their interest, but is kept alive to protect the person who has thus expended his money.   The authorities are full and clear upon this point, and so far as we are aware, without conflict.   27 *Am. & Eng. Ency. of Law*, 246; *Todd* v. *Oglebay*, 158 Ind. 595; *Wood* v. *Smith*, 51 Iowa, 156; *Kinnear* v. *Lowell*, 34 Me. 299; *Rogers* v. *Hedemark*, 70 Minn. 441; *Gerdine* v. *Menage*, 41 Minn. 417; *Baker* v. *Terrell*, 8 Minn. 195; *Greenwell*

v. *Heritage*, 71 Mo. 459; *Woodbury* v. *Swan*, 58 N. H. 380; *Curry* v..*Hall*, 15 W. Va. 867; *Halbut* v. *Padelford*, 38 S. W. R. 592; *Jumel* v. *Jumel*, 7 Paige, 591; *Cox* v. *Wheeler*, 7 Paige, 248; *Tice* v. *Annin.*, 2 Johns Ch. 128; *Brewer* v. *Staples*, 3 Sanf. Ch. 584; *Weeks* v. *Garvey*, 56 N. Y. Super Ct. 557; *Arnold* v. *Green*, 116 N. Y. 566; *Stanhope's Estate*, 6 Pa. Dist. 179; *Barker* v. *Parker*, 4 Pick, 505; *Welton* v. *Hull*, 50 Mo. 296; *Waring* v. *Ward*, 7 Ves. 337.

*Richard D. Hynson* and *William W. Beck*, for the appellees.

The plaintiffs' third prayer in their bill of complaint asks that they be reimbursed for the amount of money which they expended in paying the mortgage loan. A careful reading of the mortgage discloses that they were only doing what they were legally and morally bound to do—namely, pay that which they had contracted to pay. Harry B. Parsons cannot be excused from paying a just debt because his interest in the farm had been sold at Sheriff's sale. He was still a party to the mortgage and bound by all of its covenants and agreements. Therefore, as stated by JUDGE BROWN in his opinion, neither of three—Grace N. Parsons Clark, Harry B. Parsons and William G. Parsons—can be treated as a volunteer in paying said mortgage debt, interest and costs; Harry B. Parsons because of his liability under his covenant, and Grace N. and William G., the other two, because of their covenant liability and their interest in the farm and their right to protect it from sale. That the plaintiffs should have or be entitled to contributions from the other heirs or devisees cannot nor has it ever been questioned. But to insist that a party to a contract should be reimbursed for payments made which he should make, is certainly a novel proposition, both in law and in equity.

"Where two or more persons are interested in a mortgaged property, subject to the mortgage, and one of them pays the mortgage debt for his own protection, he is entitled not to have the mortgage assigned to him but simply to succeed to the lien of mortgage against the others in equity to the extent

of his claim against them for indemnity by way of subroga-
tion." *Holland* v. *Citizens National Bank*, 8 L. R. A. 554;
*Virginia* v. *Ches. & Ohio Canal Co.*, 32 Md. 501.

The interest on this mortgage was more than four years in
arrears, the property depreciating in value, and it would have
been to the interest of all concerned to have it sold. Messrs.
Hynson and Beck had filed a bill in equity to get control of
this mortgage, but after finding out the condition of the prop-
erty and the amount of interest in arrears notified Mr. Urie
that they consented for him to sell the property, provided it
brought $4,500, but not to assign it to any one else, which
proposition Mr. Urie accepted. As Mr. Urie refused to as-
sign the mortgage and the appellants then paid it off, they
cannot escape the legal effect of said payment, which was the
extinguishment of the mortgage, as far as their interests were
concerned. "There is no general rule better settled or more
just in itself, than that parties who enter into contracts, and
especially contracts in writing, must be governed by them as
made, according to their true intent and meaning, and must
submit to the legal consequences from them."

"The principle is well settled that the payment of an incum-
brance by one whose duty is to pay, extinguishes it." *Boyd*
v. *Parker*, 43 Md. 202; *Walker* v. *Stone*, 20 Md. 195; *Swan*
v. *Patterson*, 7 Md. 164; *Virginia* v. *Ches. & Ohio Canal Co.*,
32 Md. 504.

BOYD, J., delivered the opinion of the Court.

Isaac Parsons devised a farm known as "Mount Pleasant"
to Harry B. Parsons, Gracie N. Parsons, William G. Parsons,
Louis B. Parsons and Mary E. Morris, wife of J. Elwood
Morris. The testator directed that his real estate be charged
with any deficiency in his personal estate necessary to pay his
debts, and as Gracie N., William G. and Louis B. Parsons
were then minors, a proceeding was instituted in the Cir-
cuit Court for Kent County, wherein Harry B. Parsons was
authorized on behalf of the infants, to unite with the adults in
the execution of a mortgage for the sum of $1,522.35, that

being the amount chargeable on the farm, together with interest thereon, and costs that were incurred.

On January 2nd, 1894, a mortgage was given for said sum to Thomas W. Eliason, Jr., by Harry B. Parsons, in his own right and as trustee for the three minors, and by Mr. and Mrs. Morris. It contained a power of sale and covenants by Harry B. Parsons, trustee, for the three infants, that they would pay one-half, by said Parsons individually that he would pay one-third, and by Mr. and Mrs. Morris that they would pay one-sixth of the mortgage debt and interest as stipulated. No interest was paid on the mortgage and on the 18th of June, 1901, $1,500 of it was assigned to John D. Urie, committee, and the remainder ($357.89) to him, individually. Before this controversy, Gracie N. Parsons and William G. Parsons had become of age. The former had married John F. Clark and Mrs. Morris had died leaving surviving her an infant child, E. Romie Morris, and her husband, J. Elwood Morris. On December 17th, 1901, W. W. Beck and Richard D. Hynson purchased the one-third interest of Harry B. Parsons in the farm, under an execution issued on a judgment against him and his father.

The interest not being paid, Mr. Urie advertised the property for sale on February 1st, 1902, under the power contained in the mortgage. Efforts were made to induce him to assign the mortgage on payment of the amount due, including accrued costs, but he declined to do so. On the day of sale Mr. Clark, representing his wife, Harry B. and William G. Parsons, together with several friends, called upon Mr. Urie and tendered him $2,025, the amount he claimed to be due. He asked if they wanted the mortgage released and one of them said, "No, they wanted it assigned," to which Mr. Urie replied that he would not do that, and declined to receive the money. They reported what had occurred to Mr. Barroll, the attorney who represented the mortgagors, and he instructed them to again tender the money without asking for an assignment or anything else. They did so, and Mr. Urie testified about that interview as follows: that shortly before

the hour of sale, J. R. Usilton, accompanied by Harry B. Parsons, and others, again made him a tender of the $2,025, "saying that he did not want any release or any assignment of the mortgage, that he simply wanted me to take the money and make no sale of the farm." He asked for a few minutes to consider the matter and said he then saw Messrs. Hynson and Beck, who were anxious to have the property sold in order to realize on their interest, as the "property was going down under the management of the Parsons and the interest on the mortgage steadily accumulating. They notified me they had arranged to take up this mortgage under legal process unless I proceeded with the sale. I determined to go on with the sale unless the Parsons should agree to have the mortgage released."

When the sale was about to take place at the court house door, Mr. Barroll went there with his clients and tendered the money. There is some conflict between the witnesses as to what then occurred. Mr. Urie testified that he told Mr. Barroll that he would sell the property unless they agreed that the mortgage should be released, that Mr. Barroll replied "you can release it or burn it up. I don't care what becomes of it, here is your money." He said he repeated once or twice that it was understood that he was to release the mortgage, to which Mr. Barroll assented and he (Urie) called the clerk and released the mortgage in Mr. Barroll's presence. Mr. Barroll testified that he tendered the money to Mr. Urie, told him he must not sell the property and that he asked for no assignment or anything else; that Mr. Urie said he would release the mortgage, and "I replied with some emphasis that I did not care what he did, that whatever he did would have no effect, but there was his money." Others present at the court house gave their versions of what took place, and while there is some difference in their recollections, there can be no doubt Mr. Barroll never gave his consent to any action by Mr. Urie that would have the effect of permanently relieving the property from the lien of this mortgage. Mr. Urie had emphatically refused to accept the money unless he released the mort-

gage, as he testified himself, and when Mr. Barroll tendered him the money, he, in effect, made the same statement to him. The sale was about to take place and although the money was then tendered Mr. Urie he again refused to accept it unless the mortgage was released. It is true he did release it in the presence of Barroll, but it cannot be properly said that he gave his consent to that—on the contrary Barroll warned him it would have no effect.

The money paid to Mr. Urie had been borrowed by Harry B. Parsons, William G. Parsons and Mrs. Clark from or through Mr. Barroll, and subsequently a judgment was given to the Second National Bank of Chestertown for the amount, which it still holds. Harry B. Parsons, Mr. and Mrs. Clark, William G. Parsons and Harry B. Parsons, trustee, filed this bill against John D. Urie and Louis B. Parsons, who was still a minor, and subsequently Mr. Morris and his infant child were made defendants. The prayers of the bill are: (1) That a decree be passed for the sale of the real estate; (2) That an order be passed annulling and vacating the release of the mortgage; (3) That a decree be passed for said sale under the terms and conditions named in the mortgage, and that the amount due under the mortgage be paid to the plaintiffs to reimburse them for the amount they paid Urie; (4) That the proceeds of sale be distributed among the parties entitled thereto, according to their respective rights and interests, and (5) For general relief. The lower Court decreed that the release be annulled, vacated and revoked as to the undivided one-sixth of Louis B. Parsons and also as to the one undivided sixth formerly owned by Mrs. Morris, but as to the other mortgagors that the release was operative and effective; that Harry B. and William G. Parsons and Mrs. Clark be subrogated and substituted for each of said one-sixths, which the decree fixed at $337.50 with interest from February 1st, 1902. The decree then required each of those sums to be paid by March 15th, together with one-half of the costs of this suit, and in default thereof authorized the sale in the usual form. From that decree this appeal was taken by the plaintiffs.

1. Messrs. Hynson and Beck, who now own the undivided third in the property which formerly belonged to Harry B. Parsons, were not made parties to the bill. They were, however, consulted by Mr. Urie before he declined to accept the money, and he unquestionably adopted the course he did for their supposed benefit, as his testimony shows, and they appeared as solicitors for him in the Court below, as well as in this Court. They filed a demurrer in the name of Urie which was overruled, and then a disclaimer was filed by Mr. Hynson for Mr. Urie. Both of them were witnesses in the case and they were unquestionably the real defendants, although not parties to the bill. They not only had a full and thorough opportunity presented for making all the defenses at their command but they did in fact, as solicitors, conduct and control the defense. They will, therefore, be bound by the decree in this case as fully as if they were formal parties to the bill, as it has long since been held by this Court that the term "parties" "includes those who are directly interested in the subject-matter of the suit, knew of its pendency, and had the right to control and direct or defend it." *McKinzie* v. *B. & O. R. R. Co.*, 28 Md. 174. The subject has been further considered by this Court in *Parr* v. *State*, 71 Md. 235; *Albert* v. *Hamilton*, 76 Md. 304; *Fetterhoff* v. *Sheridan*, 94 Md. 454, and other cases but in none of them did the parties held to be bound take such active parts throughout the controversies as these gentlemen did. The failure to make them formal parties cannot therefore in any way interfere with our determining the questions involved—although they be affected by our decision.

2. We will next determine whether under the circumstances disclosed by the record the plaintiffs are entitled to have the release annulled and vacated and to be subrogated to the rights of the mortgagee. As indicated above, there can in our opinion be no doubt that neither the plaintiffs nor their attorney, Mr. Barroll, were willing to have the mortgage released, or that they or any of them ever gave their consent to such release. Nor have we the slightest doubt that it was Mr.

Urie's duty to accept the money tendered him, without imposing the condition that the mortgage be released.   Conceding that he could not be required to assign it, when the money was tendered him upon the understanding that he do nothing but accept it, it is difficult to understand upon what principle he could refuse it.   If his acceptance of it would have worked an extinguishment of the mortgage lien Messrs. Hynson and Beck would have received the benefit of that, and if it would not have had that effect it would have remained *in statu quo*, with the rights of all parties unaffected.   It was therefore unquestionably the fair and proper course to pursue, to accept the money without insisting upon releasing the mortgage.   It is impossible to see how Mr. Urie could in any way have been injured by pursuing that course, and Messrs. Hynson and Beck whom he seemed desirous of protecting, could not thereby have sustained the loss of anything they were entitled to.   The property was ample.   Mr. Urie testified that it was understood between him and Messrs. Hynson and Beck that it must bring $4,500.00, if sold the day it was to be offered. That would have realized over $700.00 for Messrs. Hynson and Beck for the third interest, for which they paid $255.00 at the Sheriff's sale a few weeks before.   If the mortgage lien is extinguished, they, by the conduct of Mr. Urie will receive $675.00 more than they could possibly have contemplated when they purchased the third interest, or are entitled to, and those who paid the money may lose that much or more.   Is a Court of equity so helpless that it cannot prevent such manifestly unjust results?   We think not, and authorities are abundant to sustain the contrary view.

It must be conceded that the general principle is that the payment of an incumbrance by one whose duty is to pay extinguishes it, although there are exceptions to the general rule which are as well settled as the rule itself.   As we have seen, the equity of Harry B. Parsons in the property had been sold, and there is ample testimony to show that it was purchased subject to the mortgage.   Mr. Hynson testified that they so purchased it, and he and Mr. Beck said they tendered

$1,925.00 for the mortgage debt, interest and costs the day of the sale to them. There can be no doubt that if Harry had been compelled by Mr. Urie to pay the one-third of the mortgage debt, in accordance with his covenant, he could have been subrogated to the rights of Mr. Urie to that extent. Many authorities are collected in the note in 27 *Am. and Eng. Ency. of Law*, 246, to the effect that where a mortgagor conveys premises subject to the lien of the mortgage, the amount of the mortgage debt being deducted from the purchase price, *the premises remain a primary fund for the payment of the debt*, and if the mortgagor is compelled to pay the debt he may be subrogated to the rights of the mortgagee. And if the mortgaged property be sold at a judicial sale, subject to the mortgage, there can be no possible reason why the same principle should not be applied. The purchase-price is lessened by the amount of the mortgage and the purchaser will not be permitted in a Court of equity to thus take advantage of the mortgagor. In *Baker* v. *Terrell*, 8 Minn. 195, which is a leading case on the subject, the question is discussed at length, and after saying the mortgagor may even voluntarily pay the debt which the mortgage secures, without prejudice, the Court goes on to say, "It is objected that in such cases the mortgagor, if he pays, is only cancelling a debt of his own. This is true in one sense, but yet the debt is one of which, as between him and a grantee who takes subject to the mortgage, the land is pledged to the payment before calling upon the mortgagor; and besides, it may with equal truth be said that the mortgagor but pays his own debt, whether he pays the incumbrance voluntarily or at the end of an execution. But it does not follow in either case that the grantee should receive any benefit from such payment, or that the land in his hands is thereby relieved of the incumbrance." In *Barker* v *Parker*, 4 Pick. 505, a property was sold by the Sheriff subject to a mortgage. After that sale, the mortgagee entered upon the premises and then sold and released all his right to the mortgagor. The purchaser at the Sheriff's sale contended that by virtue of the conveyance from the mort-

gagee to the mortgagor the mortgage was by law extinguished. The Court said that "Such undoubtedly would have been the legal operation of the conveyance if Barker (the mortgagor) had at the time been seized of the equity; but if he had parted with his right in equity, the conveyance operated as an assignment of the mortgage. The only question, therefore, to be considered is, whether the sale of the equity by the Sheriff is equivalent to an absolute sale by the mortgagor; and so far as it relates to the point in question, we are of opinion that it is. The sale by the Sheriff conveyed all the mortgagor's estate in the premises.". Other cases might be quoted from, but we do not deem it necessary. An examination of the authorities cited in the volume of the *Ency. of Law* above referred to will show that it is well settled that payment of a mortgage by a mortgagor, *after he has sold his equity of redemption, subject to the mortgage*, does not, in the absence of such intention, extinguish the mortgage, *as between him and the grantee*, and both reason and authority make this principle as applicable to a sale by a sheriff as to one made by the mortgagor himself. We are not aware of any decision in this State upon this precise question, but this Court has applied in a number of cases the doctrine of subrogation or substitution, as it is also termed, and in some of them even when third persons were affected. See *Orem* v. *Wrightson*, 51 Md. 43; *Millholland* v. *Tiffany*, 64 Md. 455; *Robertson* v. *Mowell*, 66 Md. 538; *Cone* v. *Criss*, 72 Md. 102; *Williams* v. *Harlan*, 88 Md. 5; *Reimler* v. *Pfingsten*, unreported case referred to in 78th Md. xiv, which can be found in 28 *Atl. Rep.*, 24.

It may be well to observe that Harry B. Parsons cannot be treated as a volunteer, stranger or intermeddler, for he was not only a party to this mortgage in his individual capacity, and covenanted to pay one-third of it, but he was a party as a trustee for the three infants—one of whom was still a minor when the bill was filed. He as trustee had covenanted that they would pay the one-half of the mortgage debt, and without stopping to consider how far he could be held liable on such a covenant, he certainly had such an interest in that half

—especially as to the two undivided sixths owned by his minor brother and infant niece—as would relieve him of the charge of being a stranger, volunteer or intermeddler.   It was his right, if not his duty, to protect the interest of those infants and prevent a forced sale of the property, which frequently results in a sacrifice.   It would, therefore, seem clear that the one-third interest of Harry was not discharged from the mortgage by the payment to Urie, and every principle of justice demands that it be kept in force against Messrs. Hynson and Beck, who purchased that interest subject to the mortgage.   As was said in *Arnold* v. *Green*, 116 N. Y. 571, "The remedy of subrogation is no longer limited to sureties and *quasi* sureties, but includes so wide a range of subjects that it has been called the mode which equity adopts to compel the ultimate payment of a debt by one who in justice, equity and good conscience ought to pay it."

3.   But there is another reason which seems to have been lost sight of by the learned Judge who decided this case below, which applies to the interests of all these appellants.   It is well settled that if one tenant in common pay a mortgage debt, he can "keep the mortgage on foot until reimbursed the moiety paid for the other tenant in common."   *Stebbens* v. *Willard*, 53 Vt. 665; *Look* v. *Horn*, 97 Me. 283.   It is manifest that Mr. Urie would not have not received payment of less than the whole mortgage and the appellants borrowed the whole amount and confessed judgment for it.   Each of them is therefore responsible for the whole sum, and as testified to by Mr. Barroll, they became so with the understanding that the release of the mortgage was under the circumstances a nullity; that the mortgage would be enforced and out of the proceeds of sale those who had given the judgment would be indemnified.   If Mrs. Clark, for example, was required to pay the whole judgment or more than her share she would undoubtedly be entitled to be subrogated against the interests of Harry and William, as well as against those of the two infants.   She only had a one-sixth interest in the property, but there is no proof that she only paid one-sixth of the

mortgage—on the contrary she became responsible for the whole, and if the mortgage should be held to be released, she may be required to pay the entire amount, or at least as much of it as can be made out of her property. So with each of the others. It cannot now be determined how much either of them would have to pay if the mortgage lien is held to be extinguished, and why can they not be subrogated for all the mortgage they are responsible for? If one pays more than his share, he will certainly be as much entitled to be subrogated against the other adults for what he pays for them as he would be against the infants' shares, which the decree of the lower Court allowed. The only possible way to protect them from loss is to restore the entire mortgage lien. It must be remembered that third persons will not be affected excepting in case of Messrs. Hynson and Beck, who as shown above will get all they paid for and all they are entitled to. All of the Parsons family are now of age, excepting young Morris and the adults, including Louis B. Parsons who became of age after the bill was filed, are in Court asking that the release of the mortgage be vacated and the property sold by a trustee to be appointed by the Court. Under all these circumstances it is difficult to imagine a case which calls for the interposition of a Court of equity more strongly than the present one, and we have no doubt about the right of the plaintiffs to the relief sought.

We are of the opinion that the appellants are entitled to a decree, annulling and vacating the release as to the entire mortgage, and not simply as to the two undivided interests mentioned in the decree below, and that a trustee should be appointed to sell the whole property, or so much thereof as may be necessary, if part is sufficient to pay the mortgage in full and can be sold to advantage. Inasmuch as the action of John D. Urie subjected the appellants to the costs incurred by them, he must pay the costs, above and below.

*Decree reversed and cause remanded in order that a decree be passed by the lower Court in accordance with this opinion—John D. Urie to pay the costs, above and below.*