ANNE McE. HEIGHE *v.* JOHN A. EVANS ET AL.
[No. 115, October Term, 1932.]

*Decided February 17th, 1933.*

260

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Edwin H. W. Harlan,* for the appellant.

*Frederick Lee Cobourn,* for the appellees.

Offutt, J., delivered the opinion of the Court.

In 1916 John A. Evans owned a lot of land binding on the Susquehanna River in Havre de Grace, Maryland, which was subsequently transferred to one Philip Eckells, and by him to J. M. Stengel. In October, 1930, John A. Evans, his son, John C. Evans, and Norah Bouldin bought it from Stengel; but for reasons not disclosed, John A. Evans had the title conveyed to James J. Richardson and his wife, who was Evans' daughter. The property cost $4,800, of which John A. Evans paid in cash $1,500, John C. Evans $250 or $300, Norah Bouldin, $1,000, and the balance of $2,000 was raised by a mortgage on the property executed by James J. Richardson and his wife. Subsequently John C. Evans applied to Mrs. Anne McE. Heighe for a loan of $480, and offered to secure it by a mortgage on the property then standing in the name of the Richardsons. She loaned the money upon that assurance, and on May 11th, 1932, the Richardsons executed the mortgage, which recited that it was to secure a loan to them, so that they occupied the position of being bound by mortgages aggregating $2,480 on land in which they had no beneficial ownership, and which was occupied by John C. Evans.

After repeated fruitless attempts to collect the $480 loan, Mrs. Heighe foreclosed the mortgage which secured its re-

payment, and at the sale bought the property in for $900 subject to the first mortgage of $2,000. The sale was in due course reported, objections were filed by John A. and John C. Evans, and Martha Richardson, which, after evidence and a hearing, were sustained and a resale ordered. This appeal was taken from that order.

The objections to the ratification of the sale were: (1) Inadequacy of price; (2) that the purchaser "practiced fraud and deceit upon these objectants and their agents, in order to suppress bidding at said sale, so that the said property could be purchased at the lowest possible figure, to the damage and injury of these objectants"; and (3) "the said purchaser of the property and James J. Richardson conspired together to prevent these objectants from paying the mortgage debt on said property, which debt these objectants were ready and willing to pay for several days before said sale."

It appears from the evidence taken in connection with these objections that throughout the negotiation for the payment of the mortgage debt, John A. Evans, John C. Evans, and Martha G. Richardson were interested in having the Richardson mortgage assigned to a Mr. Thompson of York, Pennsylvania, who had agreed to advance the money to pay Mrs. Heighe what was due here under it, but that Mrs. Heighe and James F. Richardson, the husband of Martha, were unwilling that the mortgage be assigned. While not directly so stated, the reason for that conflict was that, if the mortgage were assigned, Richardson would still be bound as a mortgagor, while if it were released he would be discharged from liability, and Mrs. Heighe, to protect him, insisted on a release, and refused to assign. The Evanses, however, wanted it assigned and not released, because they could not get the money to repay Mrs. Heighe's loan to John C. Evans unless they could secure the lender by a mortgage on the property, but if the mortgage were released, the title to the property would still be in Mr. and Mrs. Richardson, and the Evanses knew that James J. Richardson would not execute another mortgage for their benefit.

It is contended by appellant that John A. Evans made an unconditional tender of the money due on the Richardson mortgage, but that contention is not supported by the record. John A. Evans, who conducted all the negotiations preceding the sale, when asked why he could not "take a plain release," said: "Then I wouldn't have anything to give to Mr. Thompson, because Mr. Richardson would not assign or sign a new obligation. I think I can tell you something that will show some connection there. Here we were caught with Jim not inclined to do a thing but let the property go to a sale. I had raised the money but had to get collateral for that,—I was going to have a deed to Mr. Thompson prepared, but they would not do a thing. The whole thing was between the two Richardsons,—Jim and John,—and Mrs. Heighe. There I was caught and that was after she had assured me that she didn't want the property." If that testimony left any doubt as to the character of the tender, it is removed by the following testimony of the same witness:

"Are you in a position today, if the court should so decree, to take over the liens on this property,—pay Mrs. Heighe and relieve Mr. Richardson of his responsibility? A. Just as soon as I can get Mr. Thompson here. I can't get off the stand and write you a check, but he has agreed to put up the money and take over the property. (The Court): With a release of the mortgage? (The Witness): By a deed to the property or an assignment of the mortgage,—either one. (The Court): There is no way that I know of that you can make a mortgagee assign a mortgage. (Mr. Cobourn): I understand that, if Mr. and Mrs. Richardson will sign the deed, the mortgage will be paid off and that will relieve them, and the title will be taken out of them. (The Court): If anything can be done about the mortgage. I don't know of any way except by a release. (Mr. Cobourn): That can be done by having a deed to the property. Q. All that you have said is based upon a deed being executed to Mr. Thompson? A. Yes, sir; or an assignment of the mortgage. (The Court): The execution of a deed by the Richardsons? (The Witness): Yes, sir. * * * Q. Did you ever tender either to

Mrs. Heighe or me any money, or the money necessary to pay off the mortgage, without the proviso that the mortgage would have to be signed? A. No, sir. I tendered it to you as legal tender without you compelling me to go to the bank and get the cash. Q. But there was always the proviso that the mortgage was to be assigned? A. I couldn't see why the mortgage could not be assigned,—Martha has offered to assign it to Mr. George Thompson, and you refused to do that on the Friday before the sale. I offered you the money then to assign the mortgage to Martha. Q. The proposition that you made a few minutes ago was that you will pay off this mortgage and the Martin mortgage, but that is also qualified with the provision that the title to the property be made to Mr. George Thompson? A. No, sir; I won't say that. I think that we can do all that by the assignment of the mortgages. (The Court): Did you insist upon an assignment of this mortgage? (The Witness): I first endeavored to get an assignment to Mr. George Thompson,—no, first I tried to get a deed to him and then I tried to get an assignment. Mrs. Heighe said that she would not make the assignment to Mr. George Thompson, and then I tendered the money on behalf of Martha,—to have the assignment made to her. * * * It was at a later date that they refused to assign the mortgage to Mr. Thompson. Then I had some advice on it and was told that one of the parties in interest would have to tender the money, and that she was compelled to take it,—that the law would make her take it. Then on Friday before the sale I went to Mr. Harlan and offered him the money for an assignment to Martha. Q. And all of those propositions were made after the property had been offered for sale? A. No, the first one. (The Court): The equity of redemption exists up to the time of sale. Q. At no time was there ever a tender made that didn't contain the provision of a deed or assignment to Mr. Thompson or Mrs. Richardson, was there? A. Yes, sir. Q. Weren't you always told, Mr. Evans, that Mrs. Heighe would accept the mortgage, interest and costs and execute a release? A. Yes, sir.. Q. She was always willing to do that? A. You told me that,—yes, sir. In fact

all she told me she wanted was her money,—that was my understanding until I found out that she bought it."

There was also evidence tending to prove that Mrs. Heighe had at one time agreed to assign the mortgage, but subsequently changed her mind. But because of its vagueness that testimony was unsatisfactory, not corroborated, was contradicted by Mrs. Heighe, and cannot be accepted as sufficient to establish as a fact the hypothesis that she did make such an agreement. It does appear, however, without contradiction, that when Evans was told that Mrs. Heighe would not assign the mortgage to Thompson, he then tendered the money due on behalf of his daughter and requested that the assignment be made to her.

Mrs. Heighe, in explaining why she insisted on a release instead of an assignment, said: "Mr. John Richardson came to me, said that he was awfully sorry about this and told me that he would bid enough to protect Jim,—he said, 'I will see that you get your money.' When it came to the details of the transfer of the mortgage, I said to Ned, 'I don't have to assign this mortgage, but I must release it; and, as I understand it, Jim would still be in the same position if I assigned it, and that I didn't think that that would be fair to John Richardson, as he was the only person who had showed the slightest interest in me or my money, and I did not think it fair to leave him in the lurch.' I also told him that I was going to see Jim Richardson and ask him if he wanted me to assign the mortgage to some one else, and that day— Q. That was the reason why you saw Mr. James J. Richardson before saying whether an assignment would be made? A. Yes, sir; absolutely. John Richardson wanted to protect Jim."

From this testimony it appears that while the legal title to the property was in the Richardsons, the Evanses and Norah Bouldin actually owned it; that the Richardsons, for purposes of the Evanses, took the title to it, and executed two mortgages on it, one for the purchase money, one to secure a loan of John C. Evans; that they were able to secure the money to repay that loan, but could only secure it by

borrowing it from a third person and giving him a lien on the property; that Martha Richardson, apparently interested in protecting her father, desired to have the mortgage assigned to the lender, but that her husband to protect himself wished to have it released; that the mortgagee, although without personal interest in that domestic impasse, voluntarily undertook to force a solution which would protect the husband Richardson at the expense of his wife and her father by insisting upon a release, and although tendered through her attorney and agent the money due, with a request that she assign the mortgage to Mrs. Richardson, refused the tender. The question is whether, upon those facts, she was entitled after that refusal to proceed with the foreclosure.

The general rule in this state is that a mortgagee cannot be required to assign a mortgage (*Shirk v. Cornell,* 136 Md. 397, 111 A. 217; *Dircks v. Logsdon,* 59 Md. 173), but that he is bound to accept such amount as may be due under it, including principal, interest, and expenses, when properly tendered (*Parsons v. Urie,* 104 Md. 248, 64 A. 927; *Kent Bldg. & Loan Assn. v. Middleton,* 112 Md. 17, 75 A. 967), without annexing any condition whatever to such acceptance (*Ibid.*), and where the person making the payment has an interest in the equity of redemption, or as a lien creditor, and the payment inures to the benefit of others jointly liable with him under the mortgage, he is ordinarily subrogated to the rights of the mortgagee against such persons. *Ibid; Jones on Mortgages,* secs. 1086, 792. But while the mortgagee has no right to impose any conditions upon an acceptance of a legal tender of the amount due thereunder, the tender will not be legal if the mortgagor annexes to it the condition that the mortgagee assign the mortgage, for, as said in *Shirk v. Cornell,* 136 Md. 397, 111 A. 217, 219: "The appellant seems to assume that he had the absolute right to require the mortgagees to assign the mortgage to Mr. Tippett, upon payment or tender of the amount, costs, etc.; but such is not the law in this state, in the absence of an agreement. The case of *Dircks v. Logsdon,* 59 Md. 173, referred to by the appellant, does not sustain his position. In that case the controversy

was as to whether what the mortgagee had done amounted to a release, but there was no intimation in the opinion that Logsdon had any right to demand an assignment from Wilson, the mortgagee, although he did voluntarily assign the mortgage. Nor is there anything in *Parsons v. Urie,* 104 Md. 238, 64 A. 927, *Kent Bldg. & Loan Assn. v. Middleton,* 112 Md. 10, 75 A. 967, or *Wingert v. Brewer,* 116 Md. 518, 82 A. 157, holding that the owner of the equity of redemption, merely as such, can require the mortgagee to assign the mortgage. There may be circumstances where a court of equity will not regard a payment by one entitled to redeem as an extinguishment of the mortgage, as illustrated in the above cases; but, although it may be unreasonable and seem harsh to refuse to assign a mortgage to the holder of the equity or to a third party under some conditions, ordinarily a mortgagee is not required to assign a mortgage, although the one asking it may be entitled to redeem it." So that the inquiry finally is whether the tender made on behalf of Mrs. Richardson was unconditional. If it was, the mortgagee was bound to accept it, and was not authorized thereafter to proceed with the foreclosure. *Parsons v. Urie, supra; Kent Bldg. & Loan Assn. v. Middleton, supra.* If it was not, then the mortgagee was acting within her legal rights in going on with the foreclosure.

In both of the cases last cited, the court found as a matter of fact that there had been an unconditional legal tender, but it may be admitted that upon the facts it is difficult to distinguish *Kent Bldg. & Loan Assn. v. Middleton* from this case. The evidence there was that counsel for the mortgagors wrote the mortgagee for a statement of the mortgage, saying at the same time, "I will pay same off * * *," and that later he inclosed a check for the amount in a letter in which he said: "Herewith enclosed I hand you check for $177.05 of the mortgage of J. K. Middleton due the Kent Building and Loan Company. Please assign the mortgage to me. I pay it at the request of Mr. Durding and Mr. Middleton. Mr. Durding writes me today he expects to take it up. He does

not want the mortgage released." Upon those facts the court held that the tender was absolute and unconditional.

But notwithstanding that decision, no such conclusion seems possible here. In those cases the mere acceptance of the money tendered would have worked an equitable assignment in favor of the person making the tender (*Jones on Mortgages,* sec. 1086), to enable him to compel contribution; but here, since Mrs. Richardson and her husband held the property by the entireties, the extent to which she could have enforced contribution against her husband is not entirely free from doubt. But whatever its extent, that kind of an assignment would not have served the purpose of Mrs. Richardson and the Evanses, and was not what they wanted, for they could only secure the money to pay the mortgage debt and expenses either by having the Richardsons execute to the lender a new mortgage on the property or by having Mrs. Heighe assign the existing mortgage. It would not have helped them to have had an equitable assignment to Mrs. Richardson, for her purpose was not to compel her husband to contribute to the payment of the mortgage, but to secure Thompson, who proposed to lend the money to pay it off. So when the testimony of John A. Evans is examined, it is found to justify no reasonable inference but that, when he tendered payment of the mortgage debt, the tender was conditioned upon the assignment by Mrs. Heighe of the mortgage either to Thompson or to Mrs. Richardson.

Evans was asked on cross-examination: "At no time was there ever a tender made that didn't contain the provision of a deed or assignment to Mr. Thompson or Mrs. Richardson, was there?" And he replied: "Yes, sir." Appellee construes that as a statement that an unconditional offer had been made. The question and answer, isolated from the context, are together unintelligible, for considered in that way he could have meant either that such a tender had been made, or that at no time had it been made. But when considered in connection with his statement as to why he wanted an assignment rather than release, and that he had offered Mr. Harlan the money "for an assignment to Martha," there

can be no reasonable doubt that when he said, "Yes," to the question, he meant that at no time had an unconditional tender been made.

While the conduct of Mrs. Heighe in refusing to assign the mortgage for no other reason than to gratify the wishes of Richardson by denying his wife the only means open to her of saving her father's property may seem harsh and oppressive, if she was within her legal rights, the motive for her acts is immaterial. That she was within those rights upon the record seems clear. The mortgage was in default, foreclosure proceedings were not instituted until repeated efforts to have the mortgagors pay the debt had failed, she at all times expressed a willingness to receive the amount due under the mortgage, but no tender of that amount was ever made to her which was not accompanied by a condition which she was not obliged to accept.

The next objection is that the purchaser practiced fraud and deceit to suppress bidding at the sale, so that the property could be bought "at the lowest possible figure." But the real objection was not that the property brought too little at the sale, but that it brought too much, and the most direct testimony tending to show an attempt to suppress bidding was that of John C. Evans, one of the appellees, who said: "Mr. Harlan assured me that Anne didn't want the property,—that all she wanted was her money. Later, after we got the fund, when I wanted to know about what trouble we were having, he said that she might take it into her head to bid. In the meantime we had inquiries from a number of people who might be interested in the property,—during that time I was living on the property and eight or ten people came in there at various times to inspect the property. Knowing that Mr. Thompson was going to bid it in for the mortgage and costs, I endeavored to get them not too much interested in it." The objection rests entirely upon statements attributed to Mrs. Heighe, that she did not want the property, but that she did want her money. From these statements the objectors inferred that she would bid no more for the property than was necessary to protect her mortgage, and

they say that, in going beyond that amount and becoming an active bidder in competition with the Evanses and Mrs. Richardson, she was in some way guilty of bad faith. But the force of that criticism is not apparent. As the result of her participation the property brought more than it otherwise would, if their testimony is to be accepted, the Evanses would as the holders of the equitable title to it have been entitled to whatever surplus that remained after the payment of the two mortgages, and were therefore in a better position to bid than Mrs. Heighe, for after that figure was reached, any surplus would have been distributed to them and Norah Bouldin. It is not shown that Mrs. Heighe had ever agreed not to bid on the property, or not to bid beyond a certain amount. Nor is it shown that she attempted to prevent others from bidding, or that the property sold for less than it should have brought; but the real objection is that the Evanses were misled, by her statement that she did not want the property but she wanted her money, into believing that she would not bid more than enough to satisfy her claim, that relying upon that belief they had arranged to raise enough to buy in the property if it sold for no more than that, but that their resources were not sufficient to buy it in when the bidding as the result of her participation went beyond that figure.

Mrs. Heighe was empowered by the statute to bid on the property at the sale (Code, art. 66, sec. 14), not only to the extent of protecting her interests, but as freely as any other person. The language of that section is peculiar. It is that the title to mortgaged property shall not be impeached or defeated or questioned by reason of the fact that it was "purchased in" by the mortgagee or for his benefit or account. A possible construction of that language could, as a result of the use of the word "in," be that the mortgagee is entitled to purchase at his own sale only when, and to the extent, necessary to protect him against loss; but any such construction would seem to be out of harmony with its apparent purpose to give the mortgagors the benefit of the competition of mortgagee in the bidding and to increase the value of the

mortgage security. It is true that in the absence of statutory or contractual authority the mortgagee would have no such power (*Jones on Mortgages,* sec. 1876), and it would also seem to be true that as to any surplus the mortgagee is a trustee for the mortgagors, and that, as a trustee may not purchase at his own sale, by analogy a mortgagee may not purchase at his own sale except to protect his own interests. But no such construction appears to have been placed on the statute in the cases where it has been considered, nor is there any reason why it should have been. For if the mortgagee is to be allowed to bid at all, to secure the full benefit of that privilege to him and to the mortgagors there is no reason why he should not be permitted to bid as freely and as fully as any other person desiring to purchase the property, subject, however, to the condition that a sale to him will be scrutinized with the utmost care, and will be avoided upon slight evidence of partiality, unfairness, or a want of the strictest good faith. The court, in referring to the power, has said in *Read v. Reynolds,* 100 Md. 291, 59 A. 669, 671: "If it had been shown to be his debt it would be a harsh and radical application of the doctrine mentioned to deny to Mr. Reynolds, under the facts of this case, the right given him by section 15 of article 66 of the Code, as assignee of this mortgage, to protect his interest by purchasing the property. That provision of our Code creates, and was designed to create, an exception to the general rule that a trustee cannot buy at his own sale, and is founded upon obviously sound reasons." In *Chilton v. Brooks,* 71 Md. 452, 18 A. 868, 870: "The objection to the sale on the ground that the executors purchased at their own sale is equally untenable. The statute expressly gives to the mortgagee the right to buy at his own sale, and his legal representatives are also expressly authorized to do so. -Code, art. 66, sec. 14." In *Chilton v. Brooks,* 69 Md. 587, 16 A. 273, 274: "This law grants exceptional privileges to mortgagees. They, or their assignees, can sell at once upon default without the delay of first obtaining a decree for that purpose; and what is more important they can become purchasers at their own sales without having their

title impeached upon that ground. Code, art. 64, sec. 13." And in *Dircks v. Logsdon,* 59 Md. 178: "The appellee became the purchaser at his own sale, but the law gives him this right, and declares that his title shall not, for that reason, 'be questioned, impeached, or defeated either at law or in equity.' Code, art. 64, sec. 13."

In none of those cases did the court intimate that under the statute there was any limitation upon the power of a mortgagee to bid at his own sale, or that there was any doubt that he could at such sale bid as freely and as fully as any one else; but from the expressions used it must be assumed that the court construed the statute as conferring that power.

There is no showing that the sale was not properly advertised, that the property was not fairly offered, that the price was inadequate, or the proceedings defective in any particular. There was an objection that the property sold for far less than its real value, but that objection was neither supported by evidence, nor pressed in this court.

Finding no valid objections to the sale reported by the trustee to Mrs. Heighe, it follows that the decree appealed from must be reversed.

> *Decree reversed, with costs, and case remanded,. for further proceedings in accordance with views expressed in this opinion.*