## SMITH ET UX. *v.* DIGGES, Assignee

[No. 347, September Term, 1970.]

*Decided March 2, 1971.*

---

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*M. Wayne Munday,* with whom were *Thomas F. Mudd* and *Mudd & Mudd* on the brief, for appellants.

*Richard J. Clark* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Raymond Smith is a resident of Indian Head, Charles County. He calls himself a "Builder & Speculator." In September 1963 he and his wife Gladys acquired 8.8 acres of land in the Second Election District of Charles County. In May 1965 they acquired an adjoining tract containing 72.7 acres. In May 1967 both tracts were mortgaged to Zadmer Enterprises, Inc. (Zadmer), to secure a $42,-000 note payable one year later. In April 1968 the appellants (Smiths) asked Zadmer to extend the time for payment of "the $42,000 note" to 10 November 1968. They agreed in their request that the granting of the extension would not constitute a waiver of "any of the terms and conditions of" the note and the mortgage. On 9 May

1969 they asked Zadmer for a further extension to 31 May 1969 and on 27 June an additional 30 day extension was requested "to make payment in full." On 12 August 1969 Zadmer docketed its foreclosure suit. The "Statement of Mortgage Debt" showed the principal to be $42,000 as of 30 July 1969. Interest at 6% from 10 May 1967 was claimed.

On 15 August the Smiths filed a petition to enjoin the sale which had already been advertised to take place on 18 August. They alleged that they had been required to "remit to * * * [Zadmer] the sum of $7,000 for the privilege of obtaining the loan," that they had paid $17,000 on account and that the value of the mortgaged land was "approximately" $129,000. The court ordered the issuance of the injunction with leave to Zadmer to move for a dissolution of the injunction within two days. Its motion was filed the next day. On 18 August, after a hearing, the injunction was dissolved and the appellee was directed to proceed with the sale. Included in the court's order was the phrase "the said Raymond Smith having voiced his consent at said hearing to proceed with the foreclosure sale."

The appellee reported that he sold the property to "J. D. & S. Construction Co., Inc. [JD&S] at and for the sum of $55,000 it being then and there and at that price the highest bidder therefor." There were only two bidders at the sale, Zadmer's agent and Smith, the president of JD&S. Zadmer's man had opened the bidding at $20,000. Smith paid the required $2,000 deposit. As president of JD&S Smith made oath that "no persons * * * [were] interested in * * * [the] purchase except the corporation." The sale was finally ratified and confirmed on 26 September, "no cause to the contrary thereof having been shown."

On 22 October the appellee, alleging the refusal of JD&S to settle, asked the court to pass an order requiring it to show cause why the property should not be resold at its risk and expense and "why the deposit should not be forfeited." The ensuing order required JD&S to

show cause on or before 13 November. On 13 November it filed a response to the order alleging a loan commitment which did not materialize as the reason for delay in settling and assuring the court that it would be able to settle on or before 28 November. The parties consented to the passage of an order extending the time for settlement to 12 o'clock noon on 25 November.

JD&S again failed or refused to settle and by a letter dated 15 December the appellee notified the Smiths that pursuant to the advertisement then being published he would again offer their property for sale on 30 December. As before there were only two bidders, Zadmer's agent and JD&S, represented by Smith. The opening bid of $20,000 was made by Zadmer's man. JD&S, at $54,000, was the successful bidder. Smith, as its president, paid the required deposit of $5,000 and he made oath that "he was not acting as agent for anyone" other than JD&S. The sale was finally ratified on 11 February, "no cause to the contrary thereof having been shown."

On 3 March 1970 the appellee once more applied for permission to sell the property alleging that JD&S "failed or refused to pay the remaining purchase price of $49,-000." On the same day the court passed an order requiring JD&S "to show cause on or before 15 March why the property should not be resold" at its risk, why the $5,000 deposit should not be forfeited and why JD&S, Smith or anyone representing JD&S or Smith "should not be required to pay a cash deposit in an amount equal to the purchase price" if JD&S, Smith or anyone in their behalf "purchases the property at [the] resale." The Ides of March having come and gone and no cause having been shown the court, on 21 March, ordered the deposit to be forfeited, the property to be resold at the risk and expense of JD&S and requiring it to pay all cash if it became the purchaser at the resale. The appellee, by a letter dated 1 April, notified the Smiths of the pending advertisement announcing his intention to sell the property on 15 April. He also stated in his letter the terms of the court's order of 21 March.

Other than the auctioneer the only persons present at the third sale were the appellee and Zadmer's man; Smith did not appear. There was no advance on Zadmer's opening bid of $20,000. The appellee reported that he sold the property to Zadmer, "it being then and there and at that price [$20,000] the highest bidder therefor." The deposit of $5,000 was paid. On 25 May the Smiths excepted to the ratification of the sale claiming usury and inadequacy of price.

The Smiths' exceptions came on to be heard before the chancellor, Parker, J., on 20 July. No evidence was offered on behalf of the Smiths, but Judge Parker heard lengthy statements from the Smiths' counsel and from the appellee. Counsel said he tried "to work out the financing and get things organized but without success." He volunteered the statement that he "had [obtained] about seventy-five percent of the money" but that he could raise no more. He sought to make much of the fact that the sale prices of $55,000 and $54,000 were the "result of competitive bidding" but he conceded they were "puff prices." Appellee said judgments totaling $18,000 were outstanding against Smith and this seems not to have been challenged. Judge Parker did not think the sale price was so inadequate as to shock the conscience of the court. He overruled the exceptions and declared the sale to be "finally ratified and confirmed." The Smiths' appeal to this Court was timely filed.

The Smiths concede, as indeed they must, *Stack v. Marney*, 252 Md. 43, 50 (1969), that usury and the quantitative integrity of the mortgage debt are matters to be determined at the time of audit, a stage yet to be reached in this case. But, they argue, the mere fact that they have indicated an intention to pursue both items "is ample reason to be suspicious of the low price bid at the final sale." Although neither charge has risen above the level of bald allegation we shall, nevertheless, give suspicion full rein in our assessment of the adequacy of the sale price.

We shall assume that the Smiths no longer have any faith in the claim, made in the court below, that the property has a value of $129,000. There is no mention of such a figure in the brief and the reference to it in argument before us seems to have been merely historical. The figure we are urged to adopt as the minimum value of the property is $54,000, the lesser of the final bids in the first two sales. It is not suggested that the maximum value is $55,000 but it seems to us such a result would be compelled by the Smiths' argument that the competitive bidding at the two sales necessarily reflects true value. Whatever validity such an argument might have would depend, of course, on the identity of the bidders. Since there is a concession that JD&S and Smith are one and the same it is clear that the only bidders were mortgagor and mortgagee. Zadmer takes the position, and this seems not to have been questioned, that in the first sale it bid only slightly more than enough to cover principal, interest, costs, counsel fees and commissions and beyond that figure it made no effort to overbid Smith. In the second sale it did not need to go as high because the $2,000 deposit in the first sale, already forfeited, was available to be applied to the costs. Again it made no effort to overbid Smith. It seems idle to suggest, in these circumstances, that Smith and Zadmer were bidding with real dollars. At the hearing below counsel for the Smiths thought they were "puff prices." We cannot agree that the bidding at either of the first two sales reflects true value.

There are only three other scraps of evidence which could be said to have any bearing on the value of the property. Only one of them provides anything more than a basis for speculation. Counsel's statement that he had been able to raise *about* 75 percent of the money suggests that someone made some kind of an appraisal of the property but what other security or guaranty may have been involved or what may have been the terms of the proposed loan we are at loss to say. In any event nothing came of it. Next is the release clause in the mortgage which provides as follows:

"The Mortgagee hereby covenants and agrees to release from the lien and effect of the within Mortgage, any part or parcels of land hereby mortgaged other than 400 feet in the Easterly direction on the West side of the Annapolis Woods Road, at the rate of Two Thousand Dollars ($2,000.00) per acre, that is to say, any piece or parcel of land covered by this said mortgage beginning at a point 400 feet on the East side of said Annapolis Woods Road; it being the intention that no piece or parcel of the land covered by this said mortgage shall be released in the manner aforementioned on any land within 400 feet of the Annapolis Woods Road."

According to our somewhat rudimentary calculation about 15 acres lie in the area 400 feet from Annapolis Woods Road leaving about 66 acres available for release. We suspect the $129,000 figure was born of the multiplication of 66 acres by $2,000. But, of course, release fees do not create value, a truism which even the Smiths now seem to concede. It seems obvious to us that Zadmer had no idea of releasing any of the road frontage and that the $2,000 per acre fee was intended to inhibit the release of any of the back land without getting a substantial payment on the note. After all the release of 21 of the 66 acres would have paid the note in full had Zadmer insisted upon it. The third scrap is an unchallenged statement made by the appellee at the hearing before the chancellor that the property was assessed for tax purposes at $10,500 representing "between fifty and sixty percent of true market value." We cannot say, on this record, that a sale price of $20,000 ought to have shocked the conscience of the court. *Silver Spring Dev. Corp. v. Guertler*, 257 Md. 291, 297 (1970); *Habib v. Mitchell*, 257 Md. 29, 35 (1970); *Butler v. Daum*, 245 Md. 447 (1967); *de-Tamble v. Adkins*, 210 Md. 414 (1956); and *Clemens v. Union Trust Co.*, 170 Md. 520, 534 (1936).

At the hearing before the chancellor the following exchange took place:

"(The Court) Your man could prevent it by being there with the money. He has very little sympathy from me.

"(Mr. Mudd) He has very little from me too, to be perfectly frank with you, and I am his attorney. Mr. Digges and I have discussed this, and I think he has used every scheme in the book to try to get this."

We might add that Smith could have mitigated his situation to some extent had he been present at the third sale. It is reasonable to suppose that he could have run Zadmer up to about $47,000. This would, at least, have precluded the exposure of himself and his wife to a decree in personam.

*Order affirmed.*
*Costs to be paid by the appellants.*