633 A.2d 438

**HURLOCK FOOD PROCESSORS INVESTMENT ASSOCIATES, et al.**

v.

**MERCANTILE–SAFE DEPOSIT AND TRUST COMPANY.**

**The HURLOCK FOOD PROCESSORS, INC., et al.**

v.

**MERCANTILE–SAFE DEPOSIT AND TRUST COMPANY.**

**Nos. 101, 102, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Dec. 2, 1993.

Lawrence G. Bohlen, Cambridge, for appellant, Hurlock.

Stanton J. Levinson, Bethesda, for appellant, Neubauer.

Nell B. Strachan (Venable, Baetjer and Howard, on the brief), Baltimore, for appellee.

Argued before BLOOM, FISCHER and MOTZ, JJ.

MOTZ, Judge.

These companion cases are appeals from the order of the Circuit Court for Dorchester County overruling exceptions to two related mortgage foreclosures and ratifying the foreclosure sales.

### (i)

In September, 1988, appellee, Mercantile Safe Deposit & Trust Co. (Mercantile or the bank), loaned a total of $3,525,000 to appellant, The Hurlock Food Processors, Inc. (HFP), for the operation of a vegetable cannery. The loans were governed by a loan and security agreement, in which HFP granted the bank a security interest in all of HFP's personal property and permitted the bank, upon HFP's default, to "sell at public or private sale ... any part of all ... personal property" and to "purchase the whole or any part" of that property, "free from any right of redemption." HFP also granted Mercantile a first lien on all HFP real property, *i.e.* on the plant, the 11 acre site on which it was located, and an additional 27 acres owned by HFP. This lien was evidenced by a deed of trust, recorded in the county land records, that permitted the bank, on default, to "bid for and acquire" the

property "and in lieu of paying cash" credit HFP with "the net sales price." On the very same day, Mercantile loaned $240,-000 to appellant, Hurlock Food Processors Investment Associates (HFPIA), for the purchase of a farm located near, but not contiguous to, the HFP plant. The farm was to be, and, in fact, was used for disposal of waste water generated in the canning process. The HFPIA loan was also secured by a deed of trust, recorded among the county land records, that contained identical language consenting to a buy-in by the bank on default of the loan. Appellant, John J. Neubauer, Jr., owns 70% of HFP's stock; the remaining 30% is owned in equal 6% portions by Wilmer Smith, Jay Williamson, Donald Bartlett, George Dongarra, and Miles Walk. The HFPIA Partnership is owned by the same individuals in approximately the same proportion of ownership. All individuals are guarantors of the HFP and HFPIA loans.

In February, 1990, HFP and HFPIA defaulted on their loans. Mr. Neubauer, the principal owner of both entities, requested that the bank delay foreclosure actions to give him time to negotiate sales of the plant and the farm to a third-party as a going concern. The bank agreed to this, and, over the next several months, Mr. Neubauer negotiated with several potential third-party purchasers. While these negotiations were ongoing, Mercantile agreed to continue financing the plant so the tomato crop could be canned. When the third party negotiations collapsed and the tomato crop had been canned, the bank began preparing for foreclosure proceedings.

On November 8, 1990, pursuant to Md.Code (1974, 1988 Repl.Vol.) § 7–105 of the Real Property Article and Md.Rules W71 and W72, Mercantile filed petitions in the circuit court for foreclosure sales against HFP and HFPIA, seeking to sell the HFP real estate, equipment, and inventory and the HFPIA farm. The court entered orders granting both petitions and directing that all property be sold; appointing Donald J. Trufant and Brendon F. Shea, both Mercantile officers who were named trustees in the deeds of trust, as trustees to make the sales; and setting forth certain terms and conditions of the sale.

The trustees engaged Michael Fox Auctioneers, Inc. (Fox) to hold public sales on December 3, 1990. Fox is a national firm based in Baltimore that specializes in auction sales of real estate, industrial equipment, and machinery, and that has extensive experience in the auctioning of food processing equipment. Fox had previously auctioned equipment for Campbell Soup, Sara Lee, and Quaker Oats and had conducted between twenty and thirty other food processing equipment sales in the previous ten years, including at least two others on the Eastern Shore. Prior to the sales, Fox marketed the properties by placing advertisements in national, regional, and local publications, mailing 20,000 copies of a color brochure that contained 12 photographs, and embarking on a telemarketing campaign. Legal ads for the HFP and HFPIA property ran, side by side, in a local newspaper, the Cambridge *Daily Banner*, for three successive weeks prior to the sales. All property—realty, inventory and equipment—was available for inspection prior to the sales, and the plant manager testified that he showed the property to prospective purchasers prior to the sales.

Both sales were held at the HFP plant. The sale of the plant was advertised to begin at 10:00 a.m., and the sale of the farm at 10:30 a.m. By 10:00 a.m., the parking lots were full, and over 200 people from at least 12 states had assembled. As one attendee testified, "it was a large auction and there were people from everywhere, it was well advertised." A list of 98 [1] persons, who registered at the sale, was attached to the Report of Sale; the former plant manager testified "approximately 15" representatives from different canneries attended.

First, the plant realty and equipment was offered as an "entirety." The auctioneer testified that "[t]he high bid was at $900,000, and that was from the bank." This bid was held in reserve and the plant was next offered without equipment; no bids were received. The equipment was then offered as an

---

1. The numbers of the list of bidders begins at 891 and continues through 998, but it appears that numbers 925, 930, 940, 955, 966, 971, 972, 975, 980, and 997 were not actually assigned to any bidder.

entirety without the plant realty; a bid of $400,000 from a third-party was received and reserved. The plant entirety was then again offered for sale and, again, no bids were received. The bank's earlier reserved bid of $900,000 on the plant entirety (realty and equipment) was then rejected. The plant realty, without equipment, was offered again, and again no bids were received. The farm was then offered. When no bids were received from any third-party on the farm, it was sold to the bank for $175,000.

After the farm was sold, the inventory was offered for sale. The inventory was first offered as an entirety. Bids from third parties reached $5.85 per case; this bid was reserved. After a brief recess, the auctioneer reopened bidding on the entirety. He placed the bank's bids of $5.90 and $5.95 per case, and when no bid from a third party over $5.85 per case was received, the auctioneer reserved the bank's bid of $5.95. The inventory was then offered line-by-line, *i.e.*, a fixed number of cases of a certain product and certain can size, until the auctioneer concluded that sales in that manner would not reach $5.85 per case. He then discontinued the line-by-line sale, and declared the sale confirmed to the Bank for $5.95 per case.

The plant's equipment was then sold on an item-by-item basis to third-party buyers for a total of $720,435.00 ($13,-141.82 was paid to two prior secured creditors of specific trucks and forklifts). At the end of the equipment sale, the plant (without equipment) was again offered for sale. Again, no bids were received from third parties. The plant realty, including improvements, the 11 acre plant site, and the nearby 27 acre parcel, were then sold to the bank for $250,000.

The auction realized the following amounts:

| | HFP Plant | HFPIA Farm |
|---|---|---|
| Plant realty | $ 250,000.00 | $175,000.00 |
| Equipment | 720,435.00 | |
| Inventory | 753,888.80 | |
| Total realized at auction from HFP Property | $1,724,323.80 | |

After the auction, the bank resold the inventory, which it had purchased for $5.95 a case, to a third party for $6.50 a case.

The yield from this resale was credited to HFP. In addition, the Bank sold to that third party a small quantity of additional inventory that had been withheld from sale; that amount was also credited to HFP. The total of these two inventory sales yielded $864,000 or an additional $110,111.20 over the $753,-888.80 realized at auction. After the foreclosure sales, the bank received an offer to purchase the HFPIA farm for $225,000 and an offer to purchase the HFPIA farm and 27 acre plot owned by HFP for $260,000. No resales of these properties have been made pending ratification of the foreclosure sales. Mercantile, however, has stated its intent to credit any gain on resales of the farm or the plant realty to the borrowers.

The trustees filed timely reports of sale on January 2, 1991 with all required supporting material. HFP and HFPIA filed numerous exceptions, discovery was taken, and a hearing on the exceptions was set for June 27, 1991. Shortly before the scheduled hearing, Mr. Neubauer, the majority stockholder of HFP and partner in HFPIA and one of the guarantors of Mercantile's loans, moved to intervene, personally, as an additional exceptor, adopting the exceptions already filed by HFP and HFPIA.[2] This motion was granted and no argument is made in this Court that this intervention was improper. Over a ten month period, the circuit court heard five days of testimony on the exceptions. Seventeen witnesses testified and numerous exhibits were admitted.

On the valuation issues, the exceptors' principal real property expert was H. Ray Stevens, a local realtor and past president of the Dorchester County Board of Realtors. Mr. Stevens testified that, using "market analysis," the fair market value of the HFPIA farm was $1,800 to $2,000 per acre, or $290,000 for the 145 acres, not counting the value of the waste water system; taking into account the existence and value of the system, he valued the farm at $462,500. The latter valuation was buttressed by the facts that (1) within the

---

**2.** We shall refer to Mr. Neubauer, HFP, and HFPIA collectively as "the exceptors."

preceding year, Mr. Stevens had sold two farms to the Town of Hurlock for spray irrigation disposal of waste water at a price of $3,190 per acre; (2) Mr. Neubauer's testimony that the cost to HFPIA to install the spray irrigation system had been approximately $100,000; and (3) Fox, in a pre-sale market analysis, had predicted that the farm would easily bring at least $375,000 at auction even if sold as bare farm-land. Mr. Stevens testified that, in his opinion, the fair market value of the HFP plant real estate, i.e., the 11–acre site with the 135,000 square-foot building, empty of equipment and not as an operating facility, was $165,000 for the land, and $1,350,000 for the "building ... assuming it was operable [as] a warehouse facility" and that the fair market value of HFP's 27–acre parcel was $270,000. Thus, Mr. Stevens' total valuation for the HFP realty was $1,785,000.

On cross-examination, however, Mr. Stevens admitted that he was not an appraiser and had not done an appraisal, but had visited the plant, empty of all equipment, after the actual sale. Mr. Stevens conceded that the lack of bids at the auction indicated a lack of market interest. He also conceded that although he would be able to advise a client to pay his valuations for the farm and 27 acre parcel, "the plant site [was] more difficult." Mr. Stevens also admitted that he had valued the plant as a warehouse, that some fairly extensive remodeling would be necessary to convert it to warehouse use, and that he did not know the cost of this remodeling. He agreed that his actual valuation of the plant building was $5 to $10 a square foot and if the $5 rather than $10 a square foot valuation was used, his valuation was $650,000, rather than the previously stated $1,350,000. Mr. Stevens also agreed that other canneries were available for sale on the Eastern Shore, and admitted that he had not sold any in Dorchester County in the "last year or two."

Ronald Reinwald, an expert appraiser of food plant equipment, who had appraised the equipment in 1987 and 1989, determined that the fair market value of the equipment on his list at the time of the sale, eighteen months following his most recent appraisal, was not less than $1.5 million. He noted

several instances in which there was a great scarcity of and market demand for certain pieces of the equipment. Mr. Reinwald, however, had not attended the auction, and could not match up his list of equipment with the auction equipment list. Wilmer Smith, HFP's former plant manager and a minority shareholder, who was, at the time of trial, employed part-time by the bank to maintain the plant, but who was called as a witness by the exceptors, testified in great detail about the condition and desirability of the equipment. He stated that some of the equipment was "obsolete" or in "poor" condition, and that many items were in "fair" condition, meaning a mechanic had to be available to perform repairs. His estimates of value were not very different from the prices obtained at the foreclosure sale; he testified that several items were sold at auction for more than his view of their fair market value, and some were sold for more than their purchase price. No appraisal was offered by the exceptors with respect to the inventory. Mr. Neubauer, however, testified that it had a fair market value of more than $1,625,000; inventory sheets introduced into evidence established that this represented the wholesale prices of this inventory at the approximate time of the sale when such products were offered for sale in the normal course of business.

John Speake, who was called as a witness by the exceptors, testified that he had negotiated with Mr. Neubauer to purchase the plant, farm, equipment and inventory, for between $1.3 and $1.4 million, in the summer and fall preceding the December sale. In response to a question from the circuit court, Mr. Speake stated that "several times" he thought the parties were "close" to a sale but negotiations broke down because Mr. Neubauer kept changing the terms and the price, and every change required additional efforts on Mr. Speake's part to determine if he would be able to get financing. (At 2:25 in the afternoon of the foreclosure sale, Mr. Speake also faxed an offer, contingent on obtaining financing, to purchase the farm, plant realty, and equipment for $1.2 million and the inventory for $6.50 a case; no party asserts before us that this bid should have been accepted.) For its valuation evidence,

Mercantile relied on Mr. Speake's testimony, the absence of bids on the farm and plant, and the lack of bids higher than the bank bid on the inventory, to show that its bids were "not shockingly low." Mr. Trufant testified that his bids were set according to a formula furnished to him by his counsel, under which he was to bid 70% of the amounts owed to the bank on the loans.

The exceptors contended below and before us that Mercantile committed a fatal "irregularity" by not advertising an "informal easement" that benefitted the farm property and the plant property by permitting plant waste water to be sprayed on farm land. The "easement" issue arose because the plant property and the HFPIA farm were not contiguous. Consequently, waste water from the plant had to be transported via pipeline across land owned by two intervening landowners, the Town of Hurlock and the Peninsula Land Company. Several witnesses testified as to the "easement." Mr. Neubauer initially stated that there was a written "lease" between the plant and farm. He later admitted, however, that he had no writing documenting this lease or easement and had found no easement recorded in the land records. Instead, he relied on (1) a recorded plat that mentions a "right-of-way" and (2) an unsigned, undated agreement. The attorney, who represented the bank at the September, 1988, closing of the HFP and HFPIA loans, testified that, although a "proposed easement" was mentioned in his files, there was no copy of an easement agreement in his files or the closing binders, that he had not seen such an agreement and that, at closing, the existence of or documentation of an easement was not discussed. Town officials testified that an easement agreement had been proposed but that such an agreement had never been submitted to the town for its approval, and that they had never seen any easement agreement between HFP and any other party.

With regard to the exceptors' argument that the plant and farm should have been sold together as one offering, four witnesses testified. Jay Williamson and Wilmer Smith, two of the minority stockholders and minority partners, stated that they and the other minority owners wanted to sell the parcels

together and had proposed this to Mr. Neubauer. Mr. Neubauer refused "want[ing] to keep them separate." Mr. Trufant, of Mercantile, testified that he had asked Smith to make an inquiry of Mr. Neubauer concerning selling the parcels together, and that Mr. Smith had reported back that Mr. Neubauer refused. Mr. Neubauer, however, testified that his "refusal" applied only to a formal merger of the two entities. It was undisputed that the HFPIA farm and HFP plant properties were separately owned by different entities and secured different, independent loans that were not cross-collateralized.

After five days of hearings on the exceptions, over a period of ten months, the parties filed lengthy post-trial memoranda. On November 30, 1992, the circuit court issued a comprehensive 26–page Opinion and Order overruling all exceptions and ratifying the sales. In it, the judge made numerous findings of fact, which will be discussed within. The circuit court concluded that the exceptors "failed to meet their burden of proving partiality, unfairness, or a lack of good faith on the part of Mercantile or Mr. Trufant" and that "the prices generated at the foreclosure sale were not so inadequate as to shock the conscience of the court."

The exceptors appeal, asserting that the circuit court erred in ratifying the foreclosure sale. In support of that claim they raise the following questions, which we have shortened for clarity:

1. Did the circuit court fail to follow the requirements of *Southern Maryland Oil, Inc. v. Kaminetz*, 260 Md. 443 [272 A.2d 641] (1971), which sets out the method to be used in considering the ratification of a foreclosure sale where the secured party is the purchaser?
2. Did the circuit court err in its determination that the sale prices were adequate?
3. Did the circuit court err in its findings that the conduct of the sale was not tainted by irregularity?
4. Did the court place the burden of proof on the wrong party?

5. Did the circuit court err in denying all relief on the ground that there was no reasonable probability of a resale?

We discuss within all issues raised by the exceptors, although not precisely in the order raised by them.

(ii)

The exceptors' first argument is that the trial court failed to follow the requirements of *Southern Maryland Oil, Inc. v. Kaminetz*, 260 Md. 443, 272 A.2d 641 (1971). Specifically, the exceptors apparently regard the following language in *Kaminetz* as critical to the outcome of these cases:

> When the purchaser at the foreclosure sale is the mortgagee or his assignee, the Courts will examine the sale closely to determine whether or not it was bona fide and proper. The Courts will set aside such a sale upon "slight evidence of partiality, unfairness or a want of the strictest good faith."

*Id.* at 450, 272 A.2d 641 (quoting *Heighe v. Evans*, 164 Md. 259, 270, 164 A. 671 (1933)). Latching upon this language, the exceptors assert that they "provided much more than the 'slight evidence' of the irregularity which is required for relief from a sale under *Kaminetz*" but were denied all relief "merely because" the circuit court was not persuaded that "the irregularities complained of had actually had an adverse impact on the sale."

The critical difficulty with this argument is that it ignores both the way in which the above quoted *Kaminetz* principle has actually been applied in Maryland and another, equally well established principle of Maryland foreclosure law. In *Kaminetz*, the exceptor alleged fraud, conspiracy, and other improper motives when the mortgagee's assignee purchased the property; the circuit court ratified the sale without a trial. The Court of Appeals did not find the "slight evidence" standard mandated reversal, but rather affirmed, specifically stating, "the mere fact" that the mortgagee's assignee purchased the property "would not invalidate the sale." *Kaminetz*, 260 Md. at 453, 272 A.2d 641. In order to escape a

demurrer, even in the situation in which the secured party purchased the property, the exceptor had to allege *"some impropriety* in the conduct of the foreclosure sale *or fraud* by the mortgagor known to the purchaser which would render the sale invalid...." *Id.* (emphasis added).

In the case that was the original source of the "slight evidence" language, *Heighe v. Evans,* 164 Md. 259, 270, 164 A. 671 (1933), the Court of Appeals went even further. The exceptor alleged fraud, conspiracy, and other improper motives, as well as inadequate price when a mortgagee purchased the property; the circuit court, after a hearing at which evidence as to these allegations was offered, sustained the exceptions, and ordered a resale. *Id.* at 261, 164 A. 671. The Court of Appeals reversed, explaining that, although a sale to a secured party will be closely scrutinized,

> there is no reason why [a secured party] should not be permitted to bid as freely and as fully as any other person desiring to purchase the property....

*Id.* at 270, 164 A. 671. There are numerous other cases in which exceptors' challenges to foreclosure sale purchases by the secured party have similarly been rejected, even though the exceptors presented some evidence, as they did here, that an inadequate price was realized or the sale was not advertised properly, etc. *See, e.g., Garland v. Hill,* 277 Md. 710, 357 A.2d 374 (1976); *Smith v. Digges,* 261 Md. 130, 136, 274 A.2d 92 (1971); *Habib v. Mitchell,* 257 Md. 29, 35, 261 A.2d 744 (1970); *Ed Jacobsen Jr., Inc. v. Chapline,* 253 Md. 70, 73–74, 251 A.2d 604 (1969); *Bachrach v. Washington United Cooperative,* 181 Md. 315, 321–22, 29 A.2d 822 (1943); *Walton v. Washington County Hosp. Ass'n,* 178 Md. 446, 451, 13 A.2d 627 (1940); *PAS Realty, Inc. v. Rayne,* 46 Md.App. 445, 451, 418 A.2d 1222, *cert. denied,* 289 Md. 739 (1980).

One of these cases, *Bachrach v. Washington United Cooperative supra,* 181 Md. 315, 29 A.2d 822, was heavily relied on by the *Kaminetz* court. For example, *Kaminetz* quoted *Bachrach* for the proposition that a State statute "expressly provided ... that no title derived through the foreclosure of

mortgaged property shall be impeached, either at law or in equity, on the ground that the property was bought in by the mortgagee or his assignee.... If the acts of the mortgagee and the assignee were lawful, their confederation does not make their acts unlawful." *Kaminetz,* 260 Md. at 455, 272 A.2d 641 (quoting *Bachrach,* 181 Md. at 325, 29 A.2d 822). Similar statutory provisions are, of course, presently a part of Maryland law. *See* Md.Code (1974, 1988 Repl.Vol.) § 7–105(e) of the Real Property Article and Md.Code (1975, 1992 Repl. Vol.) § 9–507 of the Commercial Law Article.

In *Bachrach,* the Court of Appeals also noted:

It is essential to the prompt administration of justice that the rule be inviolably observed that no court shall set aside a foreclosure sale merely because of harmless errors or irregularities committed in connection with the exercise of the power of sale, or for any slight or frivolous reasons not affecting the substantial rights of the parties.

*Bachrach,* 181 Md. at 320, 29 A.2d 822. That principle has been followed in numerous subsequent cases, *see, e.g., Wilson v. Cory,* 228 Md. 561, 565, 180 A.2d 695 (1962) (and cases cited therein); *Ten Hills Co. v. Ten Hills Corp.,* 176 Md. 444, 449–451, 5 A.2d 830 (1939), including some involving foreclosure sale purchases by secured parties. *See, e.g., Habib, supra,* 257 Md. at 34–35, 261 A.2d 744; *Walker v. Williams,* 218 Md. 312, 316–317, 146 A.2d 203 (1958); *PAS Realty, supra,* 46 Md.App. at 451–52, 418 A.2d 1222.

It seems to us that the lessons to be drawn from these cases are that, although a purchase by a secured party at a foreclosure sale will be closely scrutinized to ensure that the secured party has acted in good faith, such a sale is permitted and will not be overturned absent some (at least "slight") evidence of *true* "partiality, unfairness, or a want of the strictest good faith." *Kaminetz, supra,* 260 Md. at 450, 272 A.2d 641. Moreover, a secured party is not required to act contrary to its own interest. Claims, like those advanced here, of lack of adequate price, inadequate advertising, etc. must be proved by exceptors in cases involving secured party

purchasers just as they must be proved in any other case. As the Court of Appeals has explained,

> In general a mere allegation that a purchase price is inadequate will not be enough to invalidate a foreclosure sale. However when a mortgagee purchases at such a sale the courts will pay special attention to see that he acted in good faith. The *fact that the mortgagee is watched closely does not require him to act inimically to his own interests.* There is no evidence that the sale was not properly advertised or that bidding was discouraged. There is no evidence that the sale was attended by any fraud. *Good faith does not require him [the secured party] to pay the higher of the two appraisals.*

*Habib, supra,* 257 Md. at 35, 261 A.2d 744 (emphasis added) (citations omitted). *Accord, PAS Realty,* 46 Md.App. at 450–51, 418 A.2d 1222. Thus, the circuit court did not err in failing to follow *Kaminetz* simply because it required the exceptors to demonstrate "the irregularities complained of had actually had an adverse impact on the sale."

### (iii)

Closely related to their "slight evidence" argument are the exceptors' various arguments as to the improper conduct by Mercantile and its officer, Mr. Trufant, the trustee under the deeds of trust for the HFP and HFPIA realty.

First, relying on *Perry v. Virginia Mortgage & Investment Co.,* 412 A.2d 1194, 1197 (D.C.App.1980), the exceptors assert that the burden of proof should be placed on the trustees to demonstrate that they were "faithful to their trust." The circuit court considered this argument, or one closely akin to it,[3] and refused to adopt such a rule, pointing

---

3. The bank points out that in the court below the exceptors only complained about the burden of proof, making no specific request that it be changed and the circuit court characterized their position as seeking a "shift in the burden of persuasion." Thus, the precise argument made before us was neither raised nor decided below, but, since its fraternal twin was, we address it.

out that it would be a "contradiction" to the rule "adhered to in Maryland that '[t]he invalidity of a mortgage sale, like other judicial sales, is not presumed, and the burden of proving the contrary is on the one attacking the sale.' *Butler v. Daum,* 245 Md. 447, 453, 226 A.2d 261, 264 (1967)." That conclusion is legally unassailable. *See, e.g., Hardy v. Gibson,* 213 Md. 493, 508, 133 A.2d 401 (1957) ("[t]here is·a presumption in favor of the validity of judicial sales and the burden of establishing the contrary is on the exceptant"); *Ten Hills Co.,* 176 Md. at 449, 5 A.2d 830 ("the burden was not on the trustee to show that the sale was valid, but upon the exceptant to show it was invalid"); *Clemens v. Union Trust Co.,* 170 Md. 520, 532, 185 A. 462 (1936) (exceptions must be supported by preponderance of evidence to set aside trustee's report).

Although the exceptors concede that Mercantile was authorized under the loan documents and by statute to "bid and acquire" the farm, plant, etc. at the foreclosure sales, they assert that Mercantile's Vice President, Mr. Trufant, as a trustee under the loan documents, was prohibited from bidding at the sales. They rely on *North Baltimore Building Assn. v. Caldwell,* 25 Md. 420 (1866) and *Korns v. Shaffer,* 27 Md. 83 (1867). Neither case supports the exceptors' position. In *North Baltimore* the court held that a trustee only empowered "by a decree of a court ... to sell real estate" could not "bid for and purchase that property for a third person," *North Baltimore,* 25 Md. at 423–24; there was no express power given by the court directing that the property could be "sold at a private sale" or to the secured party or his representative. *Id.* at 422. Here, in contrast, the trustees, although authorized to act by the court, were originally empowered by the loan documents, and those documents, in turn, expressly permitted the secured party to bid and purchase at the foreclosure sales. *Korns* is even less helpful to the exceptors; it merely held that a secured party under a mortgage is like a trustee, and so cannot purchase at a foreclosure sale on terms different from those provided by the mortgage or by statute. *Korns,* 27 Md. at 90. As noted above, the exceptors concede

that here the bids of the secured party, the bank, were authorized both by the loan documents and by statute.

The only authority that we have found, or that the exceptors have cited, that does offer any support for their claim is Gordon on Maryland Foreclosures. That treatise states:

> It is always important that the lender or his agent or an officer of the lender be present at the sale to sustain the bidding to the predetermined upset price *as the Trustee may not bid.*

Alexander Gordon, *Gordon on Maryland Foreclosures* § 20.-08, at 359–60 (2d ed. 1985). (emphasis added). The cases cited by Gordon in support of this proposition, however, do not unequivocally hold that trustees are always barred from bidding at their sales. Rather, those cases hinge on whether there was a personal benefit to the trustee or third party from the transaction or whether there was adequate authority for the secured party's buy-in. *See, e.g., Love v. Rogers,* 118 Md. 525, 532, 85 A. 771 (1912) (trustee may purchase trust property for own benefit if "confirmed" by interested parties, long "acquiescence," or by failure of beneficiary to set aside transaction, quoting *Hammond v. Hopkins,* 143 U.S. 224, 251, 12 S.Ct. 418, 427, 36 L.Ed. 134 (1892)); *Welbourn v. Kleinle,* 92 Md. 114, 122–23, 48 A. 81 (1900) (where agreement expressly permitted, partner may be allowed to purchase deceased partner's interest for own account but subject to close scrutiny); *North Baltimore, supra,* 25 Md. at 423 (court appointed trustee not permitted to purchase at private sale, as agent for third party, when given no such power by court). There is no suggestion of any personal benefit here and there clearly was authority for the secured party to buy-in. Thus, the authority relied on by the exceptors does not support their claim that Mr. Trufant, as trustee, was prohibited from bidding and purchasing property at the sales, for his employer, the secured party.

We have, however, found no Maryland case approving what the exceptors assert happened here, *i.e.,* foreclosure sale purchases for a secured party by an officer of the secured

party, who was the named trustee under loan documents, which expressly permitted the secured party, but not the individual trustee, to "bid and acquire" the property at foreclosure sale. On one hand, such a practice may be contrary to general principles of trust law. On the other, there is absolutely no evidence that, even if improper, the asserted bidding by the trustee caused the exceptors any prejudice, and so, consistent with the "no harm, no foul" rule articulated in *Bachrach,* even if improper, such bidding would seem to entitle the exceptors to no relief. We need not, indeed cannot, resolve this novel question here. This is because, although the circuit court did find that "the trustee was permitted to 'buy in,'" it never found that the trustee, himself, did "buy in." Moreover, the failure to make this finding was obviously not clearly erroneous since there was virtually no evidence supporting such a finding.[4]

■ The exceptors next challenge Mercantile's use of a subsidiary, Mett, Inc. Mr. Trufant testified that it was bank policy not to hold, in its corporate name, assets like those the bank purchased at the foreclosure sales. Immediately after the sales a subsidiary, Mett, Inc., was formed, and the purchases were assigned to it. Mr. Trufant explained that Mett, Inc. was not formed or organized prior to the sale because the bank expected that the HFP and HFPIA assets would be sold to an unrelated third party. *See, Walton, supra,* 178 Md. at 451–52, 13 A.2d 627 ("it frequently happens that a mortgagee reluctantly purchases mortgaged property at his own sale in

---

4. Apparently, Mr. Trufant was never directly asked if he, personally, placed the bids. The exceptors rely on his deposition testimony in which he did at one point state "I bid" on the farm property. This "admission" loses any significance in light of Mr. Trufant's repeated testimony as to what "he" or "we" or "I" did when he was obviously speaking of what the bank did. Moreover, the auctioneer expressly asked stated that "t[he $175,000] bid on the farm was placed on behalf of the bank [b]y me [*i.e.,* the auctioneer]" and that testimony was neither controverted nor impeached in any way. The question of who did the bidding for "the bank" was simply not an issue pursued or proved at trial; indeed, the alleged impropriety of Mr. Trufant's bidding was not in any way raised in the myriad of exceptions filed by HFP and HFPIA.

order to extricate himself from a situation which threatens continual loss, thereby taking the chance of holding it for an indefinite period with the possibility of sustaining a loss on resale"). Nevertheless, the exceptors maintain that because Mett, Inc. "was not a corporation on the day of the sale," the circuit court should not have ratified a sale to it. The exceptors do not point out any way in which this asserted "wrongful conduct" hurt them. Accordingly, there seems to be no basis for sustaining an exception on this ground. *See Bachrach,* 181 Md. at 320, 29 A.2d 822.

The exceptors also challenge Mercantile's bids on the theory that they "had nothing to do with fair market value" but were based on "a formula designed to insulate the Bank against a challenge to the foreclosure sales." Mr. Trufant testified that, on the advice of counsel, it was determined that the bank would bid 70% of the *loan balances.* The exceptors assert that this formula is a misreading of a formula approved in *Durrett v. Washington Nat. Ins. Co.,* 621 F.2d 201, 203 (5th Cir.1980), *i.e.,* 70% of *fair market value.* Assuming the bank's bids were based at least in part on a misreading of *Durrett,* this does not mean that the bids are automatically objectionable. It just means that they do not have the benefit of the *Durrett* case as precedent. The legitimacy *vel non* of the amount of the bank's bids depend on whether the sales prices were inadequate, an argument that is considered *infra* at § (v).

■ Because it was assertedly "undisputed" that the "HFP plant could not be utilized as a cannery without access to a proper waste water disposal facility," *i.e.,* the HFPIA farm, and the farm "had special additional value by virtue of the spray irrigation system which linked it to the HFP plant," the exceptors assert that the bank improperly failed to: (1) offer the farm and plant as a unit and (2) disclose the easement. This argument is meritless. With regard to the failure to offer the farm and plant as a single unit, the lower court found

First, this argument ignores the plain fact that the plant and farm were owned by separate entities and, as men-

tioned previously, were not cross-collateralized. Next, Mr. Smith and Jay Williamson, both minority owners of HFP and HFPIA, testified at trial that prior to the foreclosure sale the minority owners of HFP and HFPIA expressed interest in consolidating ownership of the plant and farm, with HFP to be the sole owner. However, it was Mr. Neubauer who rejected such a transaction. Indeed, Mr. Trufant testified that when he spoke to Mr. Smith in October 1990, just two months prior to the sale, he was told that Mr. Neubauer balked at the prospect of trying to sell the plant and farm together.

The exceptors insist that Mr. Neubauer's "testimony was crystal clear that he did not oppose a joint offering" but only a merger of the entities in order to sell them together. The simple answer is that the circuit court found to the contrary and that finding is amply supported by evidence in the record.

■ The court below made equally unassailable factual findings that the existence of the alleged "easement" simply had not been proved:

[R]espondents [HFP, HFPIA and Mr. Neubauer] concede that while negotiations took place between HFP and those who owned land between the plant and the farm, no formal easement agreement was ever recorded among the county land records. Faced with the admitted lack of existence of an expressed easement grant, respondents next argue that an easement by implication existed due to a recorded plat of the HFPIA farm which purportedly shows the existence of an irrigation system on the HFPIA farm. However, Mr. Neubauer testified that the markings on the plat referred to an existing valley irrigation system, and not the system which was to be used to dispose of plant generated waste water. Next, respondents assert that even if an expressed easement or an easement by implication can not be proven, Mercantile should have inferred the existence of an easement because the only reason HFPIA purchased the farm was to insure an outlet for disposing of waste water. How-

ever, the court cannot accept such a proposition based merely on what Mercantile should have inferred.

(footnote omitted).

■ The exceptors also assert that the evidence indicated that Percy Deane, an adjoining landowner and potential buyer of the HFPIA farm, improperly colluded with the bank. Again, the circuit court carefully considered the matter and found there was insufficient evidence of collusion:

At the exceptions hearing, Mr. Deane, who was called as a witness by the respondents, testified that there were many prospective bidders at the sale, and that they had the opportunity to bid on the farm property. In addition, when asked if he had spoken on the morning of his testimony with counsel for the trustees, Mr. Deane responded that he had not, in contradiction of the testimony of one of the respondents' other witnesses, Ray Stevens. Respondents suggest that Deane's allegedly false testimony, along with his current interest in buying the farm, indicate the possibility that he altered his testimony in order to garner the favor of Mercantile.

Although a troublesome allegation, it should also be pointed out that simply because Deane did not offer testimony to respondent's liking is not sufficient to sustain a charge of collusion, or to set aside the sale. Thus, without further evidence on this matter, the court can not conclude that there existed a covert bond between Deane and Mercantile sufficient to set aside the sale.

We have, once again, carefully examined the record and find abundant support for these findings in it. We note that Mr. Deane straightforwardly conceded that, after the auction, he negotiated with the bank to purchase the farm from it; the bank, in turn, has promised that any resale profits will be credited to HFPIA.

(iv)

The next group of exceptions are directed at Fox's conduct in (1) advertising the sales and (2) conducting the sale of the equipment.

 As to the advertising, it is undisputed that the requirements of Md.Rule W74 a.2(b) were complied with in that the publication of notices of the sales ran in the Cambridge *Daily Banner* for three successive weeks prior to the sales. *See PAS Realty, supra,* 46 Md.App. at 451, 418 A.2d 1222. Nevertheless, the exceptors claim that the advertisements here were inadequate because: HFP's inventory was "treated almost as a throw away," and the inventory was sold at "far below its wholesale price." [5] These and other alleged problems with the advertising were considered and rejected by the circuit court.

The gist of these exceptions appears to be that potential purchasers were deterred by either not being made aware of the extent of inventory available for sale, or perhaps by not even making it to the sale due to receiving incorrect directions. However, respondents were unable to put on the testimony of any prospective buyers who were inhibited from purchasing at the sale for either of these two reasons. Indeed, one of the respondent's own witnesses, Wilmer Smith, estimated that at least 200 people, representing at least fifteen food processing companies and over a dozen states, attended the sale. Further, despite respondent's claim that the inventory was poorly advertised, thus explain-

---

**5.** HFP and HFPIA, but not Mr. Neubauer, also assert that the advertisements of the sales were defective because the "easement" was not "delineated" in them and the properties were not advertised as an entirety. These arguments are meritless. As explained in text above, the circuit court found there was no evidentiary support that an easement existed; thus, failure to advertise it can hardly be improper. *See Ten Hills, supra,* 176 Md. at 456, 5 A.2d 830 ("certain beneficial restrictions ... were not mentioned in the advertisement or announced at the sale, [b]ut since the record [did] not show what the restrictions were ..." or "... that there were any restrictions at all ..." objection to their omission from the advertisements or announcement was rejected). Similarly, since it was undisputed that HFPIA farm and HFP plant were separately owned and secured by different loans that were not cross-collateralized, failure to advertise them for sale as an entirety was not improper; indeed, to do so might well have been improper. *See, e.g., Patterson v. Miller,* 52 Md. 388, 397–98 (1879). Moreover, the legal advertisements for the HFP and HFPIA properties ran side by side and the properties were offered for sale on the same day, at the same place, by the same Trustees and auctioneer, at approximately the same time, so that anyone who wanted to could have purchased both.

ing why it was ultimately purchased by Mercantile and not by a third-party bidder, the fact remains that Mercantile only became the purchaser of the inventory after it submitted a higher bid than a prospective third-party purchaser. The existence of a third-party bid on the inventory is at least indicia that some prospective buyers at the sale were aware that plant inventory was to be sold.

Again, we have meticulously reviewed the record and find abundant support for this conclusion. Moreover, we note that, in addition to the legally required advertising, the sales were advertised in other newspapers. Twenty thousand brochures were mailed and the auctioneer engaged in a telemarketing campaign to publicize the sale. The brochures and advertisements contained the name, address, and telephone numbers of the auctioneer, thus providing adequate information to a prospective purchaser as to how to obtain more information about the sales. Moreover, prior to the sale, the inventory was available for inspection and was inspected by prospective purchasers.

Nor is *Kres v. Hornstein,* 161 Md. 1, 155 A. 171 (1931) to the contrary. There the court concluded that an advertisement, which failed to mention the unusual depth of a lot and that the entire lot was covered by a warehouse that was leased for 5 years, was deficient because it was the only published notice of a sale that few people attended. *Id.* at 5, 155 A. 171. These facts are not, as the circuit court recognized, similar to those at hand. In cases with more similar facts, exceptions based on inadequate advertisements have been rejected. *See, e.g., Waring v. Guy,* 248 Md. 544, 548–49, 237 A.2d 763 (1968) (failure to specify property as waterfront and specify sale "in gross" rather than as three parcels did not require reversal); *Hardy v. Gibson,* 213 Md. 493, 507, 133 A.2d 401 (1957) (inaccurate description of house did not require reversal when advertisement correctly stated lot's location and provided opportunity to inspect before sale); *de Tamble v. Adkins,* 210 Md. 414, 422–25, 124 A.2d 276 (1956) (failure to subdivide and to advertise outside region did not require reversal where efforts failed to do "what ... had not [been] done in nine

years"); *Preske v. Carroll,* 178 Md. 543, 547–48, 16 A.2d 291 (1940) (not mentioning property's dimensions and improvements did not require reversal when purchasers were not misled); *Ten Hills Co. v. Ten Hills Corp.,* 176 Md. 444, 449–54, 5 A.2d 830 (1939) (plat erroneously shown in map accompanying advertisement did not require reversal when it is properly described verbally); *Lewis v. Beale,* 162 Md. 18, 20–21, 158 A. 354 (1931) (lack of zoning information did not require reversal when it could be easily obtained by prospective purchaser).

■ With regard to the conduct of the sale of equipment, the exceptors assert "that the sale was rushed and that equipment was simply dumped without a real effort to obtain the best price . . . ." Specifically, they point to the fact that at one point early in the equipment sale, the auctioneer remarked, "[o]kay, we're not going to take little bids all day, we're gonna move along here and make up for the last couple of hours . . . . [W]e're not going to take nickel and dime bids, okay? We're going to move along and move through this, all right." The exceptors assert that, notwithstanding these admonitions, the sales did not move quickly, and so eventually, "large groupings of equipment were literally dumped by being offered as lines or groups." Again, the circuit court carefully considered these and other challenges to Fox's conduct of the sale and found:

First, it should again be noted that the respondents did not bring forth a single prospective buyer to testify that these alleged infirmities frustrated them from bidding at the sale.

. . . .

As to the "nickel and dime" comment by an auctioneer, the court can only surmise that such an admonition could be used as a tactical ploy by the auctioneer to encourage higher bids.

. . . .

. . . David S. Fox, who conducted the sale for Fox auctioneers, testified that the plant was open for inspection for

eleven days before the sale. In addition, both he and Mr. Smith testified that prospective buyers were permitted to open cans of inventory for inspection on the day of the sale.

As to not offering all available equipment as both part of a line or group and as individual items, the court notes that Fox Auctioneers is not a novice in these types of sales. According to the testimony of David Fox, Fox Auctioneers has conducted between twenty to thirty sales of food processing equipment over the last ten years, including two such sales on the Eastern Shore of Maryland. While these facts do not mean that their conduct at a sale is per se above reproach, it is simply offered for the proposition that lacking evidence of negligence or purposeful misconduct the court is simply not in a position to substitute its judgment for how the sale should have been carried out for that of the auctioneer.

Once again, our review of the record, makes it clear that these findings are supported by the evidence and so are not clearly erroneous. *See Ten Hills Co.*, 176 Md. at 454–55, 5 A.2d 830. Indeed, we note that it was undisputed that the auctioneer earned no commission on property purchased by the bank and his commission was a percentage of the amounts bid by third parties; thus, it was, of course, in the auctioneer's own interest to sell to third parties—not the bank—and to sell for the highest possible price.

(v)

Finally, the exceptors maintain that the trial court's rulings "concerning [the] adequacy of price were contrary to the evidence and to applicable law." It is well established Maryland law that inadequacy of price alone will not prevent ratification of a foreclosure sale "unless it is so grossly inadequate as to shock the conscience of the court." *Garland*, 277 Md. at 712–13, 357 A.2d 374 (and numerous cases cited therein). *See also Arban v. Rogers*, 262 Md. 738, 740, 279 A.2d 457 (1971); *Warfield v. Ross*, 38 Md. 85, 92 (1873). The exceptors concede as much; however, they assert that when inadequate price is coupled with other "evidence of irregulari-

ty" then the sale will be set aside, even if the prices might not "shock the conscience." *See, e.g., Long v. Worden,* 148 Md. 115, 122–23, 128 A. 745 (1925). This seems to be true, but here the circuit judge found that there was no other irregularity and we have upheld these findings in every respect. Accordingly, the only "price" challenge available to the exceptors in this case is that sale prices were so grossly inadequate as to shock the conscience of the court.

The circuit judge found that they were not. That conclusion, unfortunately, was not based on the flawless fact-finding that characterizes the remainder of his opinion. The following chart sets forth for each asset: 1) the "appraisals or valuations" asserted by the exceptors; 2) the trial court's statement of the exceptors' valuations; and 3) the foreclosure sale price actually bid either by the bank or by third parties for the respective assets offered at foreclosure:

| | Exceptors' Appraisals or valuations | Trial Court's statement of exceptors' appraisals or valuations | Price Realized At Foreclosure– (including resale of inventory credited to exceptors) |
|---|---|---|---|
| Plant Realty (two parcels and buildings) | 1,785,000 | 435,000[6] | 250,000 |
| Inventory | 1,625,000 | 1,350,000 | 864,000 |
| Equipment | 1,500,000 | 1,500,000 | 720,435 |
| Total HFP Property | 4,910,000 | 3,285,000 | 1,834,435 |
| HFPIA Farm | 462,500 | 462,000 | 175,000 |

■ Although the trial court erroneously stated some of the exceptors' asserted valuations, it did correctly find that the

---

6. The circuit court's principal error was apparently caused by inadvertent omission of the plant improvement valuation, $1,350,000, in stating the exceptors' realty valuation and, instead, adding the values for the 11 acre plant site and 27 acre lot, *i.e.,* $165,000 and $270,000 = $435,000. In light of the voluminous record in this case and the multi-day trial spread out over several months, this error is understandable, albeit certainly regrettable. We note that no party moved for reconsideration on this basis, and so the circuit court was never given an opportunity to correct its mistake.

farm was sold for 37% of its asserted valuation and that equipment and inventory were both sold at the auction for approximately 47% of their asserted valuations. Including Mercantile's resale of the inventory, this percentage increases to 53% for the inventory (resale price of $864,000). The trial court, however, erred in finding that the plant realty sold for 57% of the asserted valuation. Actually, the plant realty sold for substantially less than the claimed valuations and so all HFP assets—inventory, equipment and realty—were sold for only 37% of their asserted values. The question before us, is do these facts indicate that the foreclosure sales prices are so grossly inadequate as to shock the conscience.[7] Several factors lead us to conclude that they do not.

First, as the circuit court noted, a court must "be hesitant to give much weight to post hoc valuations in cases of this nature." *See, de Tamble,* 210 Md. at 421, 124 A.2d 276; *Hunter v. Highland Land Co. of Baltimore City,* 123 Md. 644, 649, 91 A. 697 (1914). *See also United States v. Ross,* 554 F.Supp. 928, 932 (E.D.Mich.S.D.1983). There was certainly a basis for such skepticism here. For example, there was no appraisal of the inventory. Mr. Neubauer's valuation of it at $1,625,000 was supported by inventory sheets but the inventory sheet values showed prices at which the inventory would be sold in the normal course of business, not when a foreclosure sale was necessary. The exceptors did obtain an appraisal of the equipment but it was done by an appraiser who did not attend the auction and could not match up his list of equip-

---

7. In his appellate briefs, Mr. Neubauer's counsel expressly stated that "no purpose would be served by a remand and retrial;" at oral argument he was more equivocal. Even though some, although by no means all, or even most, of the circuit court's reasoning was erroneous, no remand is required because it is well established that an appellate court can affirm a judgment even if based on incorrect reasoning. *See e.g., Loyola Fed. Sav. & Loan Ass'n v. Galanes,* 33 Md.App. 559, 568, 365 A.2d 580 (1976). Moreover, here the circuit judge had all the figures before him; a fair reading of his opinion is that, although he misstated some figures, after carefully considering days of testimony and numerous exhibits he had concluded that there was no irregularity and the prices realized at the foreclosure sale were not so inadequate as to shock the conscience.

ment with the auction list, and a much lower valuation was given the equipment by Mr. Smith, who was intimately familiar with it.

The exceptors' chief expert as to the value of all realty—whether HFP or HFPIA property—was Mr. Stevens. We have carefully reviewed his testimony. We are particularly struck by the following question and his answer:

> Q. Have you formulated in your own mind an estimate of what you would advise a client to pay to obtain any of these properties?

> A. Yes, if you wrote them down as I testified. I have strong feelings about the farm price [$462,500] and the 27 acre parcel [$270,000]. The *plant site is more difficult.*

(emphasis added). This exchange followed Mr. Stevens' concessions that (1) other canning plants were available on the Eastern Shore, (2) to convert the HFP plant to a warehouse, which was the use for which he had valued it, would require "extensive remodeling," the cost of which he had not estimated and (3) his valuation of the plant building was actually "$5–$10 a square foot" and, at $5 a square foot, its value would be $650,000 less than the $1.3 million valuation stated on direct examination. Thus, Mr. Stevens' testimony also supports the circuit court's "hesitancy" to give "much weight" to the exceptors' post hoc valuations.

Jack Speake, who also testified for the exceptors, related that in the months preceding the auction, he negotiated for sixty days with Mr. Neubauer to purchase the "whole project . . . equipment, property, inventory and receivables" for between $1.3 and $1.4 million. Mr. Speake testified, without contradiction, that he was very close to a sale and would have purchased the "whole project" except Mr. Neubauer continually changed the terms. Mr. Neubauer did not offer testimony to dispute this account. Mr. Speake's testimony, like Mr. Stevens' substantiates the circuit court's "hesitancy" to give "much weight" to the exceptors' post hoc valuations. Indeed, Mr. Speake's testimony appears to be an accurate assessment of the value of this property, immediately prior to auction, in

the same recessionary climate, and with an actual purchaser. The total price realized at auction for the "whole project"— farm, plant, inventory, and equipment—(in excess of $1.9 million), of course, exceeded the price Mr. Speake was willing to pay a few months prior to the foreclosure sale ($1.3 to $1.4 million).

Moreover, as the circuit court noted, "[o]ne does not expect a price produced at a forced sale to be commensurate with fair market value." *McCartney v. Frost*, 282 Md. 631, 640, 386 A.2d 784 (1978). Thus, in considering the post-foreclosure appraisal and arguments that the prices realized at a foreclosure sale are inadequate, a court should keep in mind the statement of the Court of Appeals in *Lewis* 162 Md. at 23, 158 A. 354, that "a fair price at [foreclosure sale] public auction is one of the best evidences of actual value." In the case at hand, no other party bid on the plant or farm and the bank outbid those who did bid on the inventory. Hence, there was no interest in purchasing the real estate at any price and no interest in purchasing the inventory at even its normal wholesale price. The *Lewis* court noted that a "forced sale," by its very nature, will not garner fair market value; "the standard is that of a forced sale, fairly made, rather than that of a voluntary sale by the owner...." 162 Md. at 23, 158 A. 354. The court explained that when, as here, a foreclosure sale in the event of default was the "condition upon which the loan was obtained," it "was a part of the mortgage security, and the mortgagors necessarily contemplated that a sale involved the probability that the price received for the property would not be its full market value.... [A forced sale] is due to the default of the debtor, who must assume the agreed consequences of the default." *See also, McCartney*, 282 Md. at 640, 386 A.2d 784; *Federal Land Bank of Baltimore, Inc. v. Esham*, 43 Md.App. 446, 466, 406 A.2d 928 (1979) ("[t]he prices obtained for property sold at foreclosure are usually incommensurate with the appraised 'market value'....").[8]

---

8. The exceptors, without addressing *McCartney, Lewis* or *Esham*, insist that "Mercantile ... attempts to inject an improper standard for review

The exceptors strenuously object to the circuit court's finding that ordering a resale here would be a "mere experiment." Yet, Mr. Speake's testimony, combined with Mercantile's promise that it will credit any gain on resales of the farm or the plant realty to the borrowers, *i.e.*, HFP and HFPIA, does a great deal to eliminate all doubts as to the adequacy of the prices realized at the foreclosure sales. To be sure, any resale now cannot be for the inventory, equipment, and all realty, as a package, because the inventory and equipment have already been sold to third parties. But the HFP realty and HFPIA farm still could be resold as a single purchase, and the exceptors will receive the benefit of any gain on resale. In view of the bank's agreement to credit any gains on resales to the borrowers, the circuit court's finding that ordering a resale here would be a "mere experiment" seems entirely correct, particularly in the absence of evidence that another foreclosure sale could obtain a better price. As the circuit court noted such "experiments" are to be avoided. *See Preske,* 178 Md. at 551, 16 A.2d 291.

Finally, we believe that the conclusion reached here, as to the challenge to the adequacy of the sales prices, is consistent with Maryland case law. There is, as might be expected, no case with precisely the same facts or same exceptions. In all of the cases on which the exceptors rely for their claim that the prices realized here were inadequate, however, the court found significant problems with the foreclosure sales other than inadequate price. *See, e.g., Waters v. Prettyman,* 165 Md. 70, 166 A. 431 (1933) (27 lots were advertised and sold as

---

of price by suggesting, incorrectly, that there is such a thing as 'auction value' and that this should be utilized rather than the well understood concept of 'fair market value.'" We do not interpret the bank's arguments in this way; if the bank is making this argument, we reject it. The adequacy of prices realized at a foreclosure sale is determined by comparing them to the fair market value of the property sold at the time of the sale. Nevertheless, as *Lewis, McCartney* and *Esham* note, and as the exceptors themselves virtually concede, values realized at a foreclosure sale are often not that which would be realized if a seller has the ability to wait indefinitely for the desired price. It was, therefore, entirely proper for the trial court to note and consider this when determining the adequacy of price.

an entirety when they should have been advertised and offered separately); *Long,* 148 Md. at 122–23, 128 A. 745 (setting aside sale "rest[ed] upon" inadequate price, improper advertising, and imprudent conduct of sale); *Herman v. Mondawmin Bldg. & Loan Co.,* 145 Md. 480, 125 A. 814 (1924) (alternative bidder dissuaded from bidding); *Boynton v. Remson,* 133 Md. 101, 104 A. 527 (1918) (two rival foreclosure sales held on same day); *James Robertson Mfg. Co. v. Chambers,* 113 Md. 232, 77 A. 287 (1910) (grossly inadequate advertisement); *Hubbard v. Jarrell,* 23 Md. 66 (1865) (533 acre parcel should have been sold as farms, in the way in which it was already divided, and not as single parcel). As the exceptors themselves concede, the "shocks the conscience" standard is inapplicable when inadequate price is combined with no other such problems. Therefore, all of the above cases provide no precedent for finding the sale prices here inadequate.

The very few cases in which the courts of this State have held, or even suggested, that the inadequacy of the price realized at a foreclosure sale, in and of itself, required that a sale not be ratified the ratio of the sale price to the asserted fair market value was less than the 37% ratio here, *see, McCartney,* 282 Md. at 640, 386 A.2d 784 (sheriff's sale) (parcel with fair market value of $18,000 sold for $2,000; ratio of sale price to fair market value was 11%); *Hubbard, supra,* 23 Md. at 83 (parcel purchased the preceding year for $7,000 and valued at $8,000 sold for $2,000; ratio of foreclosure sale price to fair market value was 25%), or, unlike the case at hand, a substantially higher fair market value was *undisputed. See James Robertson Mfg. Co., supra,* 113 Md. at 236, 77 A. 287.

On the other hand, in a number of cases proportionately less "adequate" foreclosure sales prices have been upheld. The sales prices here generated funds, which will pay 60% of the HFP debt (sales prices of $1,834,435; debt of $2,920,552.20) and almost 80% of the HFPIA debt (sales price of $175,000; debt of $222,666.71). Sales prices that did not recover as much of the secured debt have been upheld. *See, e.g., Smith v. Digges,* 261 Md. 130, 274 A.2d 92 (1971) (debt in excess of

$47,000; foreclosure price $20,000 recovered 43% of debt); *Ten Hills Co.*, 176 Md. at 454, 5 A.2d 830 (debt in excess of $90,000; foreclosure price of $18,000 recovered only 20% of debt).[9]

Similarly, although the exceptors bitterly complain that the foreclosure prices have only yielded 35% of their asserted fair market value, prices that yielded a similarly small percentage of the asserted fair market value have not been found inadequate. *See Ed Jacobsen, Jr., Inc. v. Chapline*, 253 Md. 70, 73, 251 A.2d 604 (1969) (foreclosure price of $60,000 only 40% of asserted fair market value of $150,000); *Butler v. Daum*, 245 Md. 447, 452, 226 A.2d 261 (1967) (foreclosure price of $2,400, only 30% of asserted fair market value of $7,950); *de Tamble*, 210 Md. at 420–21, 124 A.2d 276 (foreclosure price of $28,500, only 15% asserted fair market value of $185,000).

The result reached here may seem harsh, but as the Court of Appeals explained more than fifty years ago

> It is clear that if a mortgagee or his assignee complies with the terms of the power of sale in the mortgage, and conducts the foreclosure sale properly, the court will not set aside the sale merely because it brings loss and hardship upon the mortgagor. Strict enforcement of a mortgagee's right may prove to be harsh, but the law generally disregards such a result, because a default by the mortgagor is a violation of the deliberate agreement of the parties, and the remedy is definitely fixed by statute. It is the mandatory

---

**9.** In view of the comparisons made by the Court of Appeals in a number of cases, including those cited in text above, between foreclosure price and secured debt, the circuit court's similar comparison was not, contrary to the exceptors' arguments, clearly erroneous. The circuit court did, however, add to the prices realized at foreclosure $948,-603.67 in other funds, to determine the "amount realized" on HFP assets and $11,000 in rents to determine the amount "realized" on the HFPIA farm. The bank may well have been acting properly in crediting those amounts to the HFP and HFPIA debt, but, except for the gain credited to HFP on resale of inventory originally purchased by the bank at the foreclosure sale, these amounts cannot be regarded as having been "realized" from the foreclosure sales. Rather, the correct comparison between amounts realized from the foreclosure sales and the debts is that set forth above in the text.

duty of the court to recognize the statutory remedy and enforce the right of the mortgagee.

*Bachrach,* 181 Md. at 324, 29 A.2d 822. The court below did not err in performing this "mandatory duty" and enforcing "the right of the mortgagee."

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.